COMMONWEALTH *vs.* JOHN SOUTHER & another.[1]

No. 90-P-591.

Middlesex. April 4, 1991. - August 14, 1991.

Present: ARMSTRONG, KASS, & IRELAND, JJ.

*Indecent Assault and Battery. Evidence,* Fresh complaint, Communication
between patient and psychotherapist, Privileged communication. *Privileged Communication.*

At the trial of indictments for indecent assault and battery and rape of a
child, the fresh complaint testimony of the victim's mother, to which no
objection was made, created no substantial risk of a miscarriage of justice and, in any event, was properly admitted. [221-222]

A defendant charged with indecent assault and battery and rape of a child
was not entitled to dismissal of the indictments against him on the
ground that they were founded on a report his psychotherapist had
made pursuant to G. L. c. 119, § 51A, requiring that instances of child
sexual abuse be reported to the Department of Social Services, and that
this report infringed upon the psychotherapist-patient privilege secured
him by G. L. c. 233, § 20B. [222-224]

INDICTMENTS found and returned in the Superior Court
Department on September 20, 1989.

The cases were heard by *Hiller B. Zobel,* J.

*Paul R. Cacchiotti* for John Souther.

*Ronald Ian Segal* for James McLeod.

*William F. Bloomer,* Assistant District Attorney, for the
Commonwealth.

KASS, J. Convicted of indecent assault and battery upon a
child under fourteen years of age (G. L. c. 265, § 13B), and
rape of a child under sixteen years of age (G. L. c. 265,
§ 22A), the defendants appeal on the ground that evidence
purporting to be fresh complaint was improperly admitted
against them. Souther urges that the indictments as to him

[1]James McLeod.

should be dismissed for the reason that they were founded on a violation of the psychotherapist-patient privilege contained in G. L. c. 233, § 20B. We affirm.

We rehearse the salient facts which could have been found on the evidence. At trial, the complainant, whom we shall call Sally, was fifteen years old. Sally, with her mother and sister, moved into Souther's household sometime in 1979, when Sally was six years old. Souther is Sally's great-uncle by marriage; his wife, Eileen, is her great-aunt. When Sally moved in, eight children were already part of the Souther household, including the defendant McLeod, who was then seventeen.

Souther's sexual molestation of Sally began in 1980 and accelerated in invasiveness as Sally grew. When she was nine, the conduct graduated from inappropriate fondling to digital penetration of her vagina. Molestation occurred about three to four times a week, but Sally told no one. She was frightened, thought no one would believe her, and Souther told her that he loved her. McLeod's conduct, which began when Sally was seven and he was eighteen, was of an aggravated character. Fondling quickly moved to fellatio and attempts at vaginal intercourse. McLeod told Sally that what occurred was a secret between the two of them and promised candy or cupcakes in return for participation in fellatio. Again, Sally was inhibited by fear from revealing to others what was happening while she lived in the Souther household. In 1984, when Sally was ten, she and her mother and sister moved out of the Souther household, but they continued to visit there through 1986.

Two events in the summer of 1987 appear to have brought the incidents of sexual molestation to light. First, Souther had suffered a nervous breakdown, was hospitalized for his illness, and was treated by a psychologist. During the course of treatment, Souther spoke of engaging in inappropriate conduct with two daughters of his and with Sally. The therapist felt bound by G. L. c. 119, § 51A, to report to the Department of Social Services, which in turn proceeded to investigate. Second, soon after Souther's breakdown, Sally's

mother learned from Souther's wife that there had been a pattern of sexual abuse. Sally's mother asked her if she ever had been sexually abused by Souther. After initial denial, Sally tearfully acknowledged that there had been sexual contact. She said nothing about McLeod at that time. The incidents with McLeod were acknowledged two weeks later. Detailed information emerged during a sexual assault interview on July 27, 1989, attended by Sally, her mother, an assistant district attorney, a child interviewer, and an employee of the Department of Social Services.

1. *Fresh complaint.* The defendants protest that Sally's revelations to her mother of sexual abuse occurred nearly two years after the last incident and, therefore, were far from fresh. When the subject of fresh complaint evidence came up at trial, McLeod's lawyer said he would object to it because, "It's anything but fresh; it's years old." An offer by the judge to rule in limine was not taken up and counsel and the judge left it that the question of admissibility would be dealt with when questions purporting to elicit fresh complaint evidence were in fact put to Sally's mother. No objection was made, however, when questions were put to Sally's mother which elicited testimony that she had asked her daughter whether Souther had sexually abused her; that Sally had responded, "Yes, he did do it"; and that it "just came out" from Sally about two weeks later that McLeod had sexually abused her. Counsel registered no surprise about those responses, nor did they move to strike the evidence they now characterize as erroneously received and prejudicial to their clients.

Issues not squarely raised in the trial court generally may not, of course, be raised for the first time on appeal. *Commonwealth* v. *Pares-Ramirez*, 400 Mass. 604, 609 (1987). *Commonwealth* v. *Densten*, 23 Mass. App. Ct. 981, 982 (1987). Compare *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 14 (1986). This is not an occasion to invoke the exception which we sometimes make when the unprotested error is palpable and there is a substantial risk of a miscarriage of justice. *Commonwealth* v. *Freeman*, 352 Mass. 556,

563-564 (1967). *Commonwealth* v. *Pares-Ramirez*, 400 Mass. at 609. The mother's account of what her daughter had said was so lacking in color or detail that it added next to nothing to the government's case. It may have been the blandness of the mother's testimony on this score that caused the defense not to trouble with objections or motions to strike. It is altogether implausible that the testimony could have been a factor in the judge's finding of the facts (this was a jury-waived trial).

In any event, the evidence was correctly admitted. Sally's testimony placed the last incident of what she considered undue fondling on Thanksgiving Day of 1986. Some nine months, therefore, had intervened before Sally first unburdened herself to her mother. We have recently had occasion to reexamine the boundaries of what constitutes fresh complaint in sexual abuse cases. See *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406 (1991). This falls safely within limits, having in mind not just the period of time but the circumstance that, during much of the period of silence, the child was living with the alleged abusers and even thereafter associated with them in a fashion where she was subject to natural fear, intimidation, inhibition, and persuasion. See *Commonwealth* v. *Amirault*, 404 Mass. 221, 229 (1989); *Commonwealth* v. *Brenner*, 18 Mass. App. Ct. 930, 931-932 (1984); *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 626 n.6 (1987). Compare *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 524-528 (1991).

2. *Psychotherapist privilege.* Souther argues that there is an irreconcilable conflict between G. L. c. 233, § 20B, which confers privileged status upon communications between a patient and a psychotherapist, and G. L. c. 119, § 51A, which requires a psychotherapist to report to the Department of Social Services instances of reasonable cause to believe that a child under the age of eighteen has suffered serious physical or emotional injury resulting from sexual abuse. Section 51A, by its seventh paragraph, expressly prescribes that G. L. c. 233, § 20B, does not prohibit filing the mandated § 57A report. There is, indeed, a surface con-

flict, but, upon scrutiny, the seeming statutory dissonance emerges as a legislative resolution of disparate, but not discordant, policy objectives.

The privilege based on G. L. c. 233, § 20B, is not an all-covering blanket. Rather, the statute establishes a patient-psychotherapist privilege[2] which pertains to *proceedings* and is to be *exercised* by the refusal of the patient to disclose or by the patient's *preventing* a witness from disclosing the communication with the therapist. For the statute to apply, there must be some proceeding in which the communication is to be adduced as evidence and the patient, who is the holder of the privilege, must take some affirmative step (most often, one supposes, through counsel) to keep the psychotherapist from giving evidence which discloses information developed in consultation and treatment. See *Usen* v. *Usen*, 359 Mass. 453, 456-457 (1971); *Petitions of the Dept. of Social Servs. to Dispense With Consent to Adoption*, 399 Mass. 279, 290 n.21 (1987); *Commonwealth* v. *Berrio*, 407 Mass. 37, 43 (1990); *Commonwealth* v. *Rexach*, 20 Mass. App. Ct. 919, 920-921 (1985); Fox, Psychotherapy and Legal Privilege, 53 Mass. L.Q. 307, 308 (1968).

One may fairly ask whether a report of potential hazard to a child or children under G. L. c. 119, § 51A, implicates the privilege statute at all. No proceeding is launched until the Department of Social Services or a district attorney acts; until then, the occasion will not have arisen for the psychotherapist to give evidence or for the patient to invoke the privilege. That may be a too literal reading of the statute, because the text of G. L. c. 233, § 20B, also sets out two instances, not involving a proceeding as that term is usually understood, when the privilege is *not* to apply. One such exception permits the psychotherapist to disclose communica-

---

[2]In pertinent part, G. L. c. 233, § 20B, as inserted by St. 1968, c. 418, provides: "Except as hereinafter provided, in any court proceeding and in any proceeding preliminary thereto and in legislative and administrative proceedings, a patient shall have the privilege of refusing to disclose, and of preventing a witness from disclosing any communication, wherever made, between [the] patient and a psychotherapist relative to the diagnosis or treatment of the patient's mental or emotional condition."

tions from the patient for the purpose of placing the patient in a hospital for the patient's own safety or the safety of others. The second exception (inserted by St. 1986, c. 188, § 7) permits a psychotherapist to disclose information obtained from the patient to an insurance company, nonprofit hospital, health maintenance organization, peer review board, and the like, for purposes of obtaining health service benefits.

What emerges from an examination of G. L. c. 233, § 20B, is that the privilege it confers is hedged and that the Legislature stated limits. The confidentiality of communications to a psychotherapist is greatly favored as a general proposition but gives way to certain urgencies which the Legislature has specifically identified. It need occasion no surprise that the Legislature chose to state an additional limitation of the privilege that is expressed in another statute, namely G. L. c. 119, § 51A, rather than in the body of § 20B itself. There is no doubt on this score; the last paragraph of § 51A, as appearing in St. 1981, c. 91, § 2, provides that "[a]ny privilege established by [G. L. c. 233, § 20B,] relating to confidential communications shall not prohibit the filing of a report pursuant to this section." As we had occasion to say in connection with an earlier version of § 51A, by absolving a psychotherapist who makes a report under § 51A from the strictures of § 20B, the Legislature gave higher priority to the protection of children than the protection of psychotherapist-patient confidences. *Hope* v. *Landau*, 21 Mass. App. Ct. 240, 243 (1985), *S.C.*, 398 Mass. 738 (1986).

*Judgments affirmed.*