COMMONWEALTH *vs.* JOSEPH JOHNSON.

No. 92-P-975.

Bristol. May 17, 1993. - August 24, 1993.

Present: DREBEN. KAPLAN. & IRELAND. JJ.

*Rape. Evidence,* Fresh complaint, Prior misconduct.

At the trial of an indictment for rape of a child in which the sole direct
  evidence against the defendant was the testimony of the alleged victim,
  admission in evidence of "fresh complaints" made forty-five months af-
  ter the alleged incident was error. [215-217]
At the trial of an indictment for the rape of a child alleged to have oc-
  curred in 1985, evidence of a single sexual touching of the victim by the
  defendant that supposedly happened in 1989 was too remote and not
  competent to demonstrate any inclination of the defendant to commit
  the acts charged in the indictment. [217-218]

INDICTMENT found and returned in the Superior Court De-
partment on November 15, 1989.

The case was tried before *Gerald F. O'Neill, Jr.,* J.

*Peter M. Onek,* Committee for Public Counsel Services,
for the defendant.

*Rebecca S. Miller,* Assistant District Attorney, for the
Commonwealth.

KAPLAN, J. A Bristol County jury found the defendant, Jo-
seph Johnson, guilty of the rape of an eight year old girl,
committed in the fall of 1985.[1] We are obliged to reverse the
judgment of conviction because of errors in the trial of the
case involving the admission, over objections, of (i) so-called
"fresh complaint" testimony that was in fact very stale, and

---

[1]The formal indictment, as limited pursuant to the defendant's motion,
was of rape of a child under the age of sixteen committed in 1985 (G. L. c.
265, § 23).

The jury acquitted the defendant of indecent assault and battery on a
child under fourteen (G. L. c. 265, § 13B).

(ii) prejudicial testimony about alleged "bad conduct" by the defendant long postdating the alleged rape.

The complainant, Theresa Smith,[2] testified at trial on April 2, 1991 (she was now aged fourteen). Her aunt Marla Gambino and Gambino's boyfriend, the defendant, moved in with Smith's family in New Bedford in August or September, 1985, and stayed for about two months. One day Smith walked into a room where the defendant was lying, clothed, on a bed. He told her to close the door, unbuttoned and unzipped his jeans, and asked her "to suck my dick." She complied.[3] Three weeks later, when she was alone in the apartment with the defendant, he asked her to do the same. She said no, she did not want to, but finally she "did it" because I was getting scared." He asked if she was going to tell anyone; she said she would not. He offered to do "it" to her; she refused. Smith acknowledged that she did not tell anyone at this time.[4]

About a month after the latter incident, Gambino and the defendant moved to Providence. During the three and one-half years that followed to February, 1989, Smith often visited them, sometimes staying for as long as a month. In turn they visited Smith's family in New Bedford. Smith testified that the defendant did not approach her in any sexual way between his departure from New Bedford in 1985 and Smith's visit to Providence in February, 1989.

---

[2] Certain pseudonyms are used throughout.

[3] A week later, according to Smith, as she was sitting fully clothed on the defendant's lap, he touched her vagina through her clothes. On cross-examination, Smith conceded that, when she told her aunt and mother, forty-five months later, about the defendant's misconduct, she didn't tell them about this alleged touching. Nor did she tell the representative of the Department of Social Services or of the district attorney's office during their separate interviews with her.

[4] On cross-examination Smith testified that she did not tell her aunt Gambino about the defendant's misconduct because she was afraid it would end the relationship between her aunt and the defendant. On redirect she said she did not tell her mother because she was "scared." Smith finally did tell, at least in part because she feared the defendant might begin to abuse the children her aunt and the defendant had together.

The prosecutor went on to ask, "Now, did something happen in 1989?"[5] The judge allowed Smith to say that on a day in February of that year she was lying on a bed in the Providence apartment with the defendant, her aunt Gambino, and one of Gambino's children; Gambino and the other child left the room; the defendant then touched her on her back "down next to my buttocks" and "started to go into my shirt." He stopped when Gambino returned to the room. One week later, Smith said, alone with the defendant, she told him she did not want him to do "all those bad things you do to me"; he agreed.

Later, in July, 1989, again on a visit to Providence, realizing, Smith said, that she would be left alone in the apartment with the defendant, and fearful of what the defendant might do, she spoke to her brother Dennis, then eight years old. Smith told Dennis about the earlier events in New Bedford.[6] Dennis wondered whether she might not have had a nightmare but told her to tell somebody. She spoke to a young woman, Rhoda, who was staying in the apartment; Rhoda gave her the same advice. Promptly she told Gambino that "Uncle Joey molested me," "made me put my mouth on his penis," and "touched me in my private part." Gambino immediately confronted the defendant. He said, "I'd rather murder somebody than molest anybody." Gambino telephoned Smith's mother, and Gambino and Smith told her what had happened. It was agreed that all concerned would meet in New Bedford. The defendant then drove Smith and Gambino there, and these three and Smith's mother sat around a table and discussed Smith's story at length. The defendant continued to deny the accusations.

The foregoing sums up Smith's direct testimony. On cross-examination, Smith testified that she "liked" the defendant; she answered yes to the question, "He was good to you when

---

[5]Objection to the "bad conduct" testimony that followed had been made by the defendant's motion in limine, which the judge denied. Objection was renewed as the testimony began.

[6]Smith said she told Dennis of a touching, but it is not clear whether she was referring here to a 1985 or 1989 episode.

he stayed with you and when you visited him, wasn't he?" Smith also suggested that she was afraid of the defendant.

The prosecution called Michael Sylvia, an investigator for the Department of Social Services, who interviewed Smith several weeks after the family discussion.[7] Smith mentioned an incident of oral sex; she referred to but one such incident. She also told him about a 1989 touching. She did not complain of any threats by the defendant.

Smith's brother Dennis testified sketchily about Smith's statement to him and about the family discussion.

Smith's mother, Dora, said the relationship between Smith and the defendant during the New Bedford period was "[v]ery good," and between 1985 and 1989 "they appear[ed] to continue to get along." In the phone conversation Smith told her of a recent touching. Describing the family meeting, the mother retold much of Smith's account of the defendant's misconduct in 1985 and 1989.

Finally, Sherri Nobre, a child abuse investigator for the Bristol County district attorney, reported Smith's statement to her about the two incidents of oral sex in 1985 and the touching in 1989. So ended the Commonwealth's case.

Gambino, for the defense, talked of the good relationship between Smith and the defendant over the years. In July, 1989, Smith told her that the defendant had been touching her chest, and "when we was in New Bedford, he made me suck his penis." According to Gambino, Smith said that she had not told anyone sooner "[b]ecause he [the defendant] said if I ever said anything, that I'd never see you [Gambino] again." Gambino said Smith mentioned this alleged remark by the defendant at the family meeting. It may be noted, however, that Smith's own testimony did not refer to such a statement by the defendant; indeed, she did not testify to any explicit threat by the defendant. (Compare note 4, *supra*.)

The defendant took the stand and flatly denied that he ever had any sexual contact with Smith. The prosecutor did not cross-examine him.

---

[7]At this point the defendant recorded objection to evidence offered on "fresh complaint."

1. *Fresh complaint.* The basis — historical, theoretical, and practical — on which fresh complaint testimony is admitted has received much attention in our courts in recent years and need not be dwelt on here. See *Commonwealth* v. *Licata*, 412 Mass. 654, 656-660 (1992); *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 412-417 (1991). It follows from the purely corroborative function of such testimony that it should be rejected unless fresh — uttered "seasonably" by the alleged victim. *Licata*, 412 Mass. at 657.[8]

Here the corpus delicti was two events of oral sex between late August and early November, 1985. Smith "complained" to the four witnesses — Dennis, her mother Dora, Sylvia, and Nobre — no sooner than about forty-five months later, in mid-to-late 1989. Now, where the victim has been a child, with a child's supposed tendencies toward repression and vacillation, our courts have accepted complaint testimony " 'many months after the incidents leading to the charges.' " *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 525 (1991)(footnote omitted), quoting from *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 626 n.6 (1987). The longest delay we have found in the child-victim cases between the sexual assault and a complaint, held admissible, has been about twenty-four months. See *Commonwealth* v. *Souther*, 31 Mass. App. Ct. 219, 221-222 (1991); *Commonwealth* v. *Hyatt*, 31 Mass. App. Ct. 488, 490-492 (1991). In these two cases, as noted in *Gardner*, 30 Mass. App. Ct. at 524, "the child's age, the length of time the child [was] away from an abusive setting, whether the perpetrator used threats or coercion, and whether the perpetrator [was] a relative or close friend of the child" were considerations that led to a conclusion (not without some doubt) that the complaint was fresh enough to have some fair corroborative function. See also *Commonwealth* v. *Quegan, ante* 129; 135 (1993).

---

[8]"[A]s time extends itself, a complaint loses character as a spontaneous accusation after grievous wrong; moreover, opportunity grows for invention or distortion of an event by mistake, twist of memory, fantasizing, contrivance, etc." *Dion*, 30 Mass. App. Ct. at 413.

The situation in the present case resembles more closely *Gardner* itself, where the thirty-eight month lapse between a father's alleged assault upon his four year old child and the child's complaint was held to put the complaint out of bounds. It is true that Smith was a child, only eight, when the incidents allegedly occurred, and that the assailant may be considered the equivalent of a near relative, living with the victim's family at the time. Smith's fear of the defendant, to which she rather equivocally testified, might account for some delay in her coming forward and speaking. Like the victim in *Gardner,* however, Smith did not testify "as to any specific threats or actions of the defendant that compelled her to be silent about the incident[s] for such a long period of time." *Id.* at 526. And, as in *Gardner,* the defendant left Smith's home within a relatively short period of time after the alleged assaults, and, "as a result, during the following [forty-five] months, [Smith] was not in his control." *Ibid.* In fact, the "assertion of generalized fear on [Smith's] part was promptly negated" by her repeated visits to the Providence home between 1985 and 1989. *Dion,* 30 Mass. App. Ct. at 414.[9]

We need not attempt to say at what specific point in time — at a lapse of twenty-five months or twenty-nine months or some other specific interval — a complaint by the victim herein would have to be pronounced stale. We are clear, however, that the running of forty-five months, a period beyond "the far end of decisional experience," *ibid.,* should have disqualified the complaints as corroborative evidence. And see Appendix.[10] Especially is this called for, since we

---

[9]Comparison of the present facts with those in *Commonwealth v. Montanino,* 409 Mass. 500 (1991), where a four-year delay was held excessive, will also be found instructive.

[10]An appendix to the *Dion* case, 30 Mass. App. Ct. at 416-417, assays the length of time between assault and complaint in the previously decided appellate cases. The longest interval found, and that in a child abuse case, was eighteen months. Our appendix to the present decision brings the account to date.

have here essentially a weak case, a contest of word against word. The error in admitting the complaints was material.[11]

2. *Bad acts.* The defendant was on trial for committing two sexual acts against Smith in 1985. Nevertheless the judge admitted testimony of a sexual touching that supposedly happened forty months later. If received to show the defendant's character or propensity to commit the crime charged, such bad acts testimony would be recognized as deeply prejudicial and plainly inadmissible. See *Commonwealth* v. *Montanino*, 409 Mass. 500, 505 (1991). However, the prosecution urges as an "exception" to the general canon the proposition, which has appeared in our cases, "that, when a defendant is charged with any form of illicit sexual intercourse, evidence of the commission of similar crimes by the same parties though committed in another place, if not too remote in time, is competent to prove an inclination to commit the [acts] charged in the indictment . . . and is relevant to show the probable existence of the same passion or emotion at the time in issue." *Commonwealth* v. *King*, 387 Mass. 464, 470 (1982), quoting from *Commonwealth* v. *Bemis*, 242 Mass. 582, 585 (1922). If an exception for "inclination" is not to subvert the canon and foster intolerable prejudice against the accused, it must be applied with care; thus the cautionary phrase, "if not too remote in time." We suggest that the single bad act here happened, if it happened at all, beyond the rim of the "remote."

In *Commonwealth* v. *Gillette*, where bad acts testimony was offered in a case of sexual assault on a child under fourteen, the court said, "[n]o case brought to our attention has dealt with an act done, or a statement made, more than a few months before or after the alleged offense." 33 Mass. App. Ct. 427, 431-432 (1992) (seven years too remote). See *Commonwealth* v. *Bemis*, 242 Mass. at 585 (four months not

---

[11]It is regrettable that, when objection was taken to the admission of complaint testimony, the judge did not pause, consider, and make a distinct ruling on whether the complaint was not late as matter of law — long recommended as the proper practice. See *Commonwealth* v. *Dockham*, 405 Mass. 618, 626 (1989).

too remote); *Commonwealth* v. *Machado*, 339 Mass. 713, 714-715 (1959) (five months); *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 103-104 (1993) (three months). Cf. *Commonwealth* v. *Brenner*, 18 Mass. App. Ct. 930, 931 (1984) (uncharged act admitted that occurred "within the time frame of the complaint"). Contrast cases of repetitive bad acts over long periods: *Commonwealth* v. *Calcagno*, 31 Mass. App. Ct. 25, 27-28 (1991) (evidence admitted that defendant had molested victim at least three times a month for eight years); *Commonwealth* v. *Brigham*, 32 Mass. App. Ct. 935, 936-937 (1992) ("a continuing course of sexual molestation by the defendant over several years, both before and after the events covered by the indictments").

There was material error in admitting testimony about the alleged 1989 touching.

3. *Further remarks.* We take note of two further points that the defendant, having objected root and branch to the admission of bad acts testimony, allowed to pass without reaction.

In instructing on bad acts, the judge, in a rather confused passage,[12] indicated that the jury might consider this testimony, "[i]n other words, to explain . . . [w]hy the incidents of 1985 came to light in 1989." The alleged incidents came to light in the victim's complaints, but the complaints occurred not at the time of the bad act — the touching — but about five months thereafter. Moreover, testimony about bad acts, inherently prejudicial, is not admissible to explain why a delayed complaint was made at a particular time or to show the victim's state of mind when he or she made the complaint. See *Montanino*, 409 Mass. at 505-507 (error to

---

[12]The judge first mentioned the permissible use of bad acts testimony "to show the absence of accident or mistake, and to show intent or motive." This was a partial reference to the usual list of "common scheme, pattern of operation, absence of accident or mistake, identity, intent, or motive." *Montanino*, 409 Mass. at 505, quoting from *Commonwealth* v. *Helfant*, 398 Mass. 214, 224 (1986). (The statement about admissibility of sexual bad acts discussed in our point 2 may be seen as a particularization of, or addition to, the list.) The judge then went on to his words quoted in the text above.

admit victim's testimony that he was prompted to make delayed complaint when he heard the defendant was abusing others; *Commonwealth* v. *Errington*, 390 Mass. 875 [1984], distinguished).

Second, although the 1989 touching was not itself charged to the defendant as a crime, Smith, besides testifying to the touching, was allowed to say that she complained of it (as well as of the rape) to others, and the others were allowed to confirm that she complained of it. So we have what amounts to fresh complaint testimony about bad acts. The fresh complaint doctrine, as applied in the usual way to sexual offenses actually in suit, is an anomaly in the law of evidence, as was recognized from an early date; it is justified for special reasons.[13] In the present case the anomaly was questionably extended to a new domain.

The judgment is reversed and the case is remanded for a new trial, if the Commonwealth should so elect.

*Judgment reversed.*
*Verdict set aside.*

APPENDIX.

Fresh complaint testimony allowed in presence of family ties or threats: *Commonwealth* v. *Scanlon*, 412 Mass. 664, 666-669, 670 n.4 (1992): seven months; fourteen year old victim; defendant was mother's husband; three incidents; threats that defendant would harm victim's family if she told. *Commonwealth* v. *Souther*, 31 Mass. App. Ct. 219, 221-222 (1991): two years; victim seven to thirteen years old; victim lived with defendant great uncle and defendant household member for four of six years of abuse; repeated abuse; victim afraid to tell. *Commonwealth* v. *Hyatt*, 31 Mass. App. Ct. 488, 490-492 (1991) two years; thirteen year old victim; defendant was sister's boyfriend (later her husband); victim afraid to tell. *Com-*

---

[13]"The doctrine [of fresh complaint] is offensive to the modern law of evidence for, as Holmes said, '[i]n general, you cannot corroborate the testimony of a witness by proof that he has said the same thing before, when not under oath.' [*Commonwealth* v. *Cleary*, 172 Mass. 175, 176 (1898).] The doctrine has a measure of prophylactic or negative value: a victim of such an offense might be expected to cry out in complaint to third persons; if the victim did not do so, his or her testimony that a criminal event occurred may become clouded." *Dion*, 30 Mass. App. Ct. at 412.

*monwealth* v. *Titus*, 32 Mass. App. Ct. 216, 218, 222-224 (1992): two months (following victim's departure from house); victim nine to eighteen years old; defendant was stepfather; repeated abuse; threats that if victim revealed abuse, she "would go to a bad place." *Commonwealth* v. *Lanning*, 32 Mass. App. Ct. 279, 284-288 (1992): two weeks from last incident; victims were sisters eleven to thirteen and nine to eleven years old; defendant was son of mother's elderly friend; repeated abuse; threats that, if victim revealed abuse, defendant would commit same acts on other sister, kill victim with BB gun, or stab and decapitate victim with steak knife; defendant frequently struck victims during abuse. *Commonwealth* v. *Tingley*, 32 Mass. App. Ct. 706, 708-712 (1992): ten months; four year old victim; defendant was victim's father; judgment reversed on other grounds. *Commonwealth* v. *Davids*, 33 Mass. App. Ct. 421, 424-425 (1992): three to five months (following defendant's departure from house); victim three or four to seven or eight years old; defendant was victim's grandmother's boyfriend; repeated abuse; defendant threatened to kill grandmother if victim told of abuse. *Commonwealth* v. *Quegan*, ante 129, 130-135 & n.11 (1993): two years; four to five year old victim; defendant was victim's father; threat that defendant would "shoot [victim's] head off if she told anybody"; freshness issue not argued on appeal.

Fresh complaint testimony allowed in absence of family ties or threats: *Commonwealth* v. *LaValley*, 410 Mass. 641, 642-646 (1991): "a few hours"; nineteen year old victim; defendant was acquaintance.

Fresh complaint testimony not allowed: *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 523-528 (1991): thirty-eight months (following defendant's departure from house, which occurred day after incident); four year old victim; defendant was victim's father; no specific threats or actions by defendant to induce victim's silence. *Commonwealth* v. *Davids*, 33 Mass. App. Ct. 421, 422-424 (1992): eight years (but three months after defendant's departure from house); victim seven to eight years old; defendant was mother's boyfriend; repeated abuse; "no evidence that [the victim] was in fear of the defendant."