## COMMONWEALTH *vs.* DONALD SWAIN.

No. 91-P-1019.

Norfolk. October 7, 1993. - May 2, 1994.

Present: KASS, JACOBS, & IRELAND, JJ.

*Practice, Criminal,* Indictment, Amendment of indictment or complaint, New trial. *Child Abuse. Rape. Indecent Assault and Battery. Evidence,* Fresh complaint, Relevancy and materiality, Sexual conduct, State of mind, Hearsay.

At the trial of fourteen indictments for alleged sexual abuse of a child, the judge properly allowed the Commonwealth's motion to amend the indictments, filed at the close of the Commonwealth's case, to change the termination dates of the periods of alleged abuse, where the precise time of the alleged sexual contacts was neither an element of the crimes charged nor a contested issue at trial. [435-436]

At the trial of indictments for sexual abuse of a child, the admission in evidence of fresh complaint testimony that was on the borderline of admissibility, when combined with the effect of the number (six) of fresh complaint witnesses, created a sufficient risk of prejudice to the defendant to require a new trial. [436, 439-442]

At a criminal trial, certain writings (poems and letters) of the alleged victim were properly admitted to rebut a suggestion by the defendant that the victim's allegations were a recent contrivance. [443]

Where a criminal defendant was entitled to a new trial on indictments alleging sexual abuse of a child, evidentiary issues relating to the complainant's having made accusations of sexual abuse against two other persons subsequent to the first trial were to be determined by the judge presiding at the new trial. [443]

At the retrial of indictments for sexual abuse of a child, the judge should allow a reasonable number of fresh complaint witnesses, the scope of whose testimony should be limited to corroboration of the complainant's testimony; further, any expert opinion with respect to general characteristics of sexually abused children should not be related specifically to the symptoms of the alleged victim in this case. [444-445]

INDICTMENTS found and returned in the Superior Court Department on January 31, 1990.

The cases were tried before *Andrew G. Meyer,* J., and a motion for a new trial was heard by him.

*Daniel J. O'Connell, III*, for the defendant.

*Robert C. Cosgrove*, Assistant District Attorney, for the Commonwealth.

JACOBS, J. The defendant was tried and convicted by a Superior Court jury on fourteen indictments alleging unlawful sexual contact with his daughter — eight indictments charged rape of a child under sixteen years of age, five charged indecent assault and battery of a child under fourteen years of age, and one charged incest.[1] He appeals from those convictions and from the denial of his motion for a new trial essentially claiming (1) the indictments suffered from a fatal lack of particularity, (2) the judge erred in admitting fresh complaint evidence and certain writings and statements of the daughter, and (3) newly discovered evidence entitled him to a new trial. We reverse on the ground of prejudicial error in the admission of fresh complaint evidence.

Born on March 7, 1975, the daughter, whom we shall call Martha, was fifteen years old at the time of the trial in December of 1990. She testified that the first of the sexual contacts by her father, who was separated from her mother, occurred when she was "about five" years old during one of her overnight visitations at his residence. She stated that this incident involved sexual intercourse and that various forms of sexual contact by her father[2] occurred on almost all of her weekly overnight visits with him at his apartments over the next nine years. She acknowledged that she never told anyone of this abuse during that period. She testified that the last such incident occurred between November 3, 1988, and December 5, 1988, and that her father never threatened her or told her not to tell anyone or that the sexual contact would

---

[1] The defendant was sentenced to a term of not less than thirty years and not more than forty years at Massachusetts Correctional Institution, Cedar Junction on one of the rape indictments and to various concurrent terms on each of the other indictments.

[2] She testified that in addition to having sexual intercourse with her, her father would rub her breasts, put his fingers in her vagina and have her masturbate him. She also testified to his masturbating in her presence during overnight and day visits.

be a secret between them. Her first report of abuse by her father occurred in October, 1989.

1. *Indictments.* The indictments alleged unlawful sexual acts as follows: three in Quincy between January 1, 1981, and January 1, 1983; two in Quincy between January 1, 1981, and January 1, 1984; seven in Holbrook between January 1, 1984, and October 1, 1988; and two between November 3, 1988, and December 5, 1988, in Holbrook. A bill of particulars filed by the Commonwealth provided specific information as to the nature of the sexual act alleged in each of the indictments but did not more precisely identify the time of any offense. At the close of the prosecution's case and over the objection of the defendant, the judge allowed the Commonwealth's motion to amend the five indictments alleging incidents in Quincy and the related information in the bill of particulars by changing the termination date of the periods alleged from January 1, 1983, and January 1, 1984, to December 30, 1987.

The defendant moved neither to dismiss the indictments nor to strike or amplify the bill of particulars. See *Commonwealth* v. *Brenner*, 18 Mass. App. Ct. 930 (1984); Smith, Criminal Practice and Procedure § 1296 (2d ed. 1983). His argument to us, that the lack of specificity in the indictments deprived him of a fair trial, not only overlooks the substantial authority permitting imprecise dates in indictments for crimes involving young victims, see *Commonwealth* v. *King*, 387 Mass. 464, 467-469 (1982); *Commonwealth* v. *Atkinson*, 15 Mass. App. Ct. 200, 203 (1983), but also ignores that he did not challenge at trial the evidence of his private access to Martha during the times in question. Instead, his defense was constructed on total denial of any impropriety. Given Martha's trial testimony of weekly sexual contact over a period of approximately nine years, the defendant's acknowledgment of regular and frequent private access to her during that time, and his argument at trial that it was highly unlikely that so many repeated instances of abuse would be unnoticed for so long a period, he hardly can complain that a lack of specificity disadvantaged his defense. For the same

reason, and because the precise time of the alleged sexual contacts was not an essential element of the crimes charged, see *Commonwealth* v. *King, supra* at 467; G. L. c. 277, § 20, the judge did not err in permitting the amendment of five of the indictments. Compare *Commonwealth* v. *Jervis*, 368 Mass. 638, 644 (1975); *Commonwealth* v. *Liebman*, 379 Mass. 671, 676 (1980).

2. *Fresh complaint evidence.* The defendant argues that the fresh complaint evidence relied upon by the prosecution was too remote from the acts complained of and therefore should not have been admitted. He also claims that there was an impermissible "piling on" of fresh complaint witnesses.

a. *Promptness of complaints.* The witnesses who testified to Martha's having told them of being abused by the defendant were, in the order of their testimony, a psychiatrist, Martha's mother, a social worker, a pediatrician, a police officer and an investigator for the Department of Social Services (DSS). These six witnesses testified to Martha's complaining to them at various times between October of 1989 and January 8, 1990. The first of the complaints was made in October of 1989 to a social worker at Westwood Lodge, an inpatient psychiatric hospital. The other complaints were in response to inquiries precipitated by the first revelation. Martha's confinement to Westwood Lodge was her second to that institution and her fourth hospitalization in approximately a year for various emotional, psychological and physical problems.[3] She was first hospitalized at the Judge Baker Center at Children's Hospital after suffering seizures in the fall of 1988. She testified that her father's last molestation of her occurred between her release from Children's Hospital and her admission to McLean Hospital in December of 1988. Her confinement to McLean was followed by her treatment at Westwood Lodge from which she was first discharged on

---

[3]The testimony of the therapist who treated Martha during her first admission to Westwood Lodge, and a staff psychiatrist who treated her during the second admission, indicated that Martha suffered from chronic depression, anorexia nervosa, pseudo-seizures, self-destructive behavior, flashbacks and borderline personality disorder, accompanied by related physical problems, but that she was not psychotic.

June 27, 1989. During this admission she spoke of being abused by her cousins, but specifically denied being abused by anyone else, including her father. This period of confinement marked the end of her regular overnight visits with the defendant, except for a brief vacation with him on Cape Cod during the summer of 1989. She testified that the defendant masturbated in her presence during this stay with him. Shortly after this vacation, she was readmitted to Westwood Lodge and it was during this second admission that her first complaint of abuse was made.

The first fresh complaint witness, a psychiatrist who treated Martha at Westwood Lodge, testified that Martha's first complaint, to her in early October, 1989, was of her father's masturbating in her presence over a course of years. When the witness was asked whether Martha said anything else, the judge overruled the defendant's objection and characterized the requested testimony as part of a fresh complaint. The psychiatrist then testified that Martha, over the course of the next month, told of having intercourse with her father when she was approximately four years old. There was no objection to the psychiatrist's agreeing that there was nothing in Martha's behavior and symptoms that was "inconsistent with a child who is sexually abused over a number of years." In unobjected-to redirect testimony, the witness testified to general correlations and consistencies between sexual abuse and several of the conditions and disorders she attributed to Martha.

Martha's mother was the second fresh complaint witness. After specific objection based on the untimeliness of Martha's conversation with her, she was permitted to testify that Martha first told her, in October of 1989, of her father having sexual intercourse with her "when she was very young," and that three weeks later, she told her about later abuse "all through her childhood" but without recounting much detail.[4]

---

[4]The judge, just prior to this point, gave an appropriate instruction to the jurors explaining to them their function with respect to fresh complaint testimony.

The third fresh complaint witness was the social worker to whom Martha first complained of sexual abuse. She testified that Martha, in response to a question, told her in October of 1989 that the defendant had had intercourse with her. After a voir dire, and over objection by the defendant, the witness told of Martha telling her that she recalled the abuse as a result of having her memory jogged by a staff person coming into the room at night. She also stated that Martha had first said there was one incident of abuse and later that sexual abuse occurred repeatedly over several years. The social worker further testified that Martha did not describe the sexual contacts in detail.

The next witness was a pediatrician specializing in adolescent medicine and child abuse and neglect who examined Martha on January 8, 1990, and testified, over objection, to a history of sexual abuse by the defendant related to her by Martha and her mother. The judge allowed the testimony "as a basis of the doctor's opinion."[5] The witness told of Martha's reporting that she had experienced "genital intercourse contact with her father" from the time she was five to seven years old until the fall of 1988. The witness then described the physical examination she conducted and, in response to several unobjected-to questions, testified essentially that the findings derived from that examination were "not inconsistent with that kind of a history."

The last two fresh complaint witnesses, testifying essentially without objection, were a police officer and an investigator for DSS who had spoken to Martha as a result of reports of sexual abuse by personnel at Westwood Lodge. The police officer, who was assigned to the sexual assault unit of the district attorney's office, interviewed Martha on January 5, 1990, and testified about Martha's detailed recounting of a long history of sexual abuse, repeating considerable specific information to the jury. The DSS investigator testified con-

---

[5]If the pediatrician's testimony was admitted as evidence that Martha was the victim of sexual abuse, there was no need of identifying the perpetrator. We, therefore, view the pediatrician's testimony as also having been admitted as fresh complaint evidence.

cerning an interview on November 8, 1989, in which Martha spoke to her in general terms of being abused by her father when she was about four years old and to frequent later instances of his having sexual intercourse with her and masturbating in her presence.

Although the defendant failed to object to the fresh complaint testimony of some of the witnesses and perhaps did not challenge the others as directly as he might have, his protests with respect to promptness were sufficient to implicate the trial judge's duty of careful scrutiny to make certain that "the prejudice inherent in the admission of borderline fresh complaint evidence [did not] outweigh its probative value, particularly since the average jury might have difficulty in understanding and applying fairly the usual limiting instruction." *Commonwealth* v. *Lagacy*, 23 Mass. App. Ct. 622, 627 (1987).[6] In any event, we determine that the admission of this evidence, viewed in the light of its undue repetition (see 2[b], *infra*), created a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967); *Commonwealth* v. *Miranda*, 22 Mass. App. Ct. 10, 21 (1986); *Commonwealth* v. *Powers, ante* 65, 70-71 (1994).

In reviewing the admissibility of fresh complaint evidence, the test we apply is "whether the victim's actions were reasonable in the particular circumstances." *Commonwealth* v. *McDonough*, 400 Mass. 639, 652 (1987). See Liacos, Massachusetts Evidence § 6.18.2, at 341-342 (6th ed. 1994). Our courts "have not insisted on great promptness for fresh complaints in prosecutions involving child sexual abuse," *Commonwealth* v. *Amirault*, 404 Mass. 221, 228-229 (1989), and have acknowledged that fresh complaint analysis in such cases should be flexible and attended by due consideration of factors which reasonably might cause a child to repress the urge to cry out to a third person. See *id.* at 229; *Common-*

---

[6]We again call attention to the preferred practice of preliminary analysis and express ruling on whether a complaint is late as matter of law. See *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 413 (1991); *Commonwealth* v. *Johnson*, 35 Mass. App. Ct. 211, 217 n.11 (1993).

wealth v. *Dockham*, 405 Mass. 618, 625-626 (1989); *Commonwealth* v. *Dion*, 30 Mass. App. Ct. 406, 413 (1991); *Commonwealth* v. *Hyatt*, 31 Mass. App. Ct. 488, 491 (1991); Liacos, Massachusetts Evidence, *supra* at 342. Among the factors which have been recognized as relevant to the determination of whether a child's complaint is reasonably prompt are "the child's age, the length of time the child has been away from an abusive setting, whether the perpetrator used threats or coercion, and whether the perpetrator is a relative or close friend of the child." *Commonwealth* v. *Dockham*, *supra* at 626. While cases have cataloged decisional experience, see *Commonwealth* v. *Gardner*, 30 Mass. App. Ct. 515, 524-526 (1991); *Commonwealth* v. *Dion*, *supra*, app. B at 416-417; *Commonwealth* v. *Johnson*, 35 Mass. App. Ct. 211, app. at 219-220 (1993), and noted the approximate outer limits of previously admitted fresh complaint testimony, *Commonwealth* v. *Johnson*, *supra* at 215, no absolute time limits for such testimony have been established. *Commonwealth* v. *Dockham*, *supra* at 625.

In explaining her failure to report the abuse until approximately nine years after it started and about ten months after the last incident, Martha testified that "[a]t first it was just very confusing and I didn't know. Then later on, when I started questioning, I thought that I didn't want to get him into trouble, and that I wanted, I mean I loved my father, and the good parts of him made up, almost made up for the bad parts." Throughout her testimony she spoke of ambivalent feelings — of having strong love for the defendant while at the same time concealing his abuse of her because of her fear that he might be jailed and that she would be unable to see him.

We recognize that in the general circumstances of this case, "the promptness of a complaint is usually measured from the date when the victim leaves the defendant's control." *Commonwealth* v. *Comtois*, 399 Mass. 668, 672 n.9 (1987). Also, although Martha did not reside with the defendant, the repeated abuse to which she testified, of itself suggests elements of control which reasonably may have in-

hibited her from complaining to a third person until after the pattern of weekly abuse ended or was significantly interrupted. In assessing the promptness of her complaints, we focus, therefore, entirely on the period between her admission to McLean Hospital in December, 1988, and the times of her report of abuse to the fresh complaint witnesses. While that time span of approximately ten to thirteen months falls well within the outer limits of the decided cases, we conclude that the complaints were on the borderline of admissibility for the following reasons: (1) in December, 1988, when the pattern of abuse was interrupted by her hospitalization, Martha was not a small child but rather an intelligent and articulate, albeit profoundly troubled, teenager[7]; (2) although she was inhibited by her love and concern for the defendant, there was no evidence of any threat, intimidation or persuasion by him[8]; (3) the complaints were not spontaneous but rather were responses to inquiries by the reporting witnesses and were made a considerable time after Martha had been asked during her first hospitalization at Westwood Lodge whether her father had abused her.[9]

While these factors, viewed separately, might not lead us to treat the judge's admission of any of the complaints as being outside of his considerable discretion, see *Common-*

---

[7]Although there was expert evidence that delayed disclosure is often associated with child abuse, there was no mention of hospital confinement as a contributing factor to such delay.

[8]Some cases have permitted delayed disclosure on the basis of inhibiting influences, notwithstanding the absence of evidence of threat, intimidation, or persuasion by the defendant. However, they generally involve abuse which occurs and ends while the victim is quite young. See *Commonwealth* v. *Brenner*, 18 Mass. App. Ct. 930 (1984) (victim was seven and eight years old during abuse; no mention in opinion of evidence of threat, intimidation or persuasion by the defendant); *Commonwealth* v. *Rockwood*, 27 Mass. App. Ct. 1137 (1989) (victim was six years old at the time of abuse; no mention of evidence of threat, intimidation or persuasion); *Commonwealth* v. *Tingley*, 32 Mass. App. Ct. 706 (1992) (victim was four years old at time of abuse; no mention of evidence of threat, intimidation or persuasion).

[9]The fact that the complaints were elicited by questioning does not, of itself, render them inadmissible. See *Commonwealth* v. *Ellis*, 319 Mass. 627, 630 (1946); *Commonwealth* v. *Brenner*, 18 Mass. App. Ct. 930, 932 (1984).

*wealth* v. *Comtois, supra* at 673, together they raise real doubt about the timeliness of the complaints which, when combined with the prejudicial effect of the number of fresh complaint witnesses, creates sufficient risk of prejudice to the defendant to require a new trial.[10]

b. *Repetitive complaints.* "[R]epetitive testimony from several witnesses regarding the details of the complaint may lend undue credibility to the complainant's testimony," and judges should, therefore, exercise caution in permitting fresh complaint testimony from numerous witnesses. *Commonwealth* v. *Licata*, 412 Mass. 654, 659-660 (1992). The risk of such "piling on" of evidence is that a "jury will use the details of the fresh complaints as substantive evidence that the crime actually occurred." *Commonwealth* v. *Lavalley*, 410 Mass. 641, 646 (1991). Here the doctrinal purpose of fresh complaint testimony — to counteract the possible discrediting effect of the absence of evidence of a prompt report[11] — was satisfied well before the sixth witness took the stand. The potential mischief in repetitive testimony was realized when all of the complaint witnesses testified to reports made within a narrow time span and in response to interrelated inquiries made as part of the same treatment and investigative setting. The substantial risk that the sheer number of witnesses would cause the jury to treat their testimony as substantive, rather than corroborative, evidence was further increased by the prejudicial circumstance of the fifth and sixth witnesses testifying in considerable detail about the sexual abuse recounted by Martha.

---

[10]Compare *Commonwealth* v. *Souther*, 31 Mass. App. Ct. 29 (1991), a case that is factually similar, but without the impermissible "piling on" of fresh complaint testimony.

[11]"The doctrine has a measure of prophylactic or negative value: a victim of such an offense might be expected to cry out in complaint to third persons; if the victim did not do so, his or her testimony that a criminal event occurred may become clouded. The doctrine is mischievous unless the complaint is truly 'fresh' and the limitations of complaints as means of corroboration are made clearly understandable to the trier." *Commonwealth* v. *Dion*, 30 Mass. App. Ct. at 412-413. See *Commonwealth* v. *Licata, supra* at 657-658.

c. *Writings.* We find no merit to the defendant's argument that certain of Martha's poems and letters[12] should not have been admitted in evidence. Not only were they reflective of Martha's state of mind but they properly were introduced to rebut the implication of the defendant's cross-examination of Martha that her allegations were recent contrivances born of her disagreement with her father with respect to whether she should be placed in a residential institutional setting upon her discharge from Westwood Lodge.

3. *The motion for a new trial.* On November 7, 1991, the defendant filed a motion for a new trial grounded on claims of newly discovered evidence consisting of: (1) evidence that Martha, subsequent to trial, accused her stepfather of sexually abusing her since she was approximately five years old with the last incident occurring on April 17, 1991; she further alleged that her stepfather, who resided in her mother's and Martha's home during much of that period and married the mother in April of 1990, had sexual intercourse with her when she was approximately eight or nine years old; and (2) evidence that Martha accused a high school guidance counselor of abusing her sometime after the conviction of her father. In light of our decision and the possibility that further evidence may be adduced with relation to the subject matter of these accusations, we think it best to leave any related evidentiary issues to the judgment of the judge who will preside over any retrial.[13]

---

[12]Six of Martha's writings were admitted in evidence over the defendant's objection. She testified she had written poems "about rape and incest and bad things . . . hoping that people would just guess what was happening between me and my father." On cross-examination defense counsel elicited her response that she "wrote [about abuse by her father] but I never exactly mentioned my father." The six writings were admitted during her redirect testimony, the judge allowing their admission "to contradict the inference that whatever [Martha] said was the day before she was released [from Westwood Lodge] the second time . . . when in fact this is what she was at least feeling continually. . . ." All of the writings were identified as having been written prior to her second admission to Westwood Lodge.

[13]Information submitted at the hearing of the motion for a new trial and pursuant to a motion to expand the record before us indicates that Martha's allegations with respect to the stepfather were the subject of an

Commonwealth *v.* Swain.

4. *Issues which may arise upon retrial.* Although the following issues were not argued to us and therefore were not factored into our decision, we address them because of the possibility they may arise upon retrial. Improper and prejudicial hearsay may have been insinuated in the trial when the third fresh complaint witness, the social worker, went well beyond relating corroborating evidence and told of Martha speaking to her of a recent event which triggered her memory of abuse, an event not referred to by Martha in her own testimony. See *Commonwealth* v. *Flebotte,* 417 Mass. 348, 351 (1994); *Commonwealth* v. *Gardner,* 30 Mass. App. Ct. 515, 527 (1991). Also, the psychiatrist and pediatrician, in addition to testifying to complaints of abuse made to them by Martha, rendered opinions that Martha's behavior, symptoms and physical condition were consistent with the type of repeated sexual abuse reported by her. Not only did this opinion evidence cross the line between description of typical symptoms of sexually abused children and testimony relating those symptoms to the victim in the case, see *Commonwealth* v. *Dockham,* 405 Mass. at 628-629; *Commonwealth* v. *Mamay,* 407 Mass. 412, 421 (1990), but it also created a substantial risk of the jury giving substantive effect to the same witnesses's fresh complaint testimony. Notwithstanding the theoretical right of a qualified fresh complaint witness also to testify to the general characteristics of sexually abused children, *Commonwealth* v. *O'Brien,* 35 Mass. App. Ct. 827, 832 (1994), prosecutors would be well advised to

---

investigation conducted by DSS under G. L. c. 119, § 51B, which resulted in administrative determinations that the allegations were "supported" and sufficient to list the stepfather on the central registry as an alleged perpetrator of sexual abuse. Such information may raise issues of admissibility to be analyzed· under the principles enunciated in *Commonwealth* v. *Bohannon,* 376 Mass. 90 (1978); *Commonwealth* v. *Lavelle,* 414 Mass. 146, 152 n.4 (1993); *Commonwealth* v. *Hrycenko,* 417 Mass. 309, 318-319 (1994); and *Commonwealth* v. *Rathburn,* 26 Mass. App. Ct. 699 (1988). The applicability of G. L. c. 233, § 21B, may also have to be addressed together with exceptions to that statute, see *Commonwealth* v. *Ruffen,* 399 Mass. 811, 814-817 (1987), and along with issues of whether such accusations are relevant, see *id.* at 816; *Commonwealth* v. *Baxter, ante* 45 (1994).

avoid such juxtaposition and, if it occurs, trial judges should be alert to its considerable prejudicial potential.

Upon retrial, the prosecution should be limited to calling only a reasonable number of fresh complaint witnesses and such witnesses, along with any other experts,[14] should not be permitted to opine as to whether Martha's behavior or condition in any way conformed to or was consistent with the general characteristics of a sexually abused child.

*Judgments reversed.*
*Verdicts set aside.*

---

[14]An expert called by the prosecution agreed, without objection, that certain facts she was asked to assume, which were based on previously admitted evidence, would not be "inconsistent with a child who was sexually abused from age five to approximately age fourteen by her father."