## COMMONWEALTH vs. JOSEPH JOHNSON.

No. 96-P-265.

Bristol. March 10, 1997. - September 16, 1997.

Present: PERRETTA, LAURENCE, & LENK, JJ.

*Jury and Jurors. Evidence,* Relevancy and materiality. *Practice, Criminal,* Jury and jurors, Indictment.

At the 1995 trial of a 1989 indictment alleging rape, the judge erred in submitting to the jury, at their request, the indictment and then instructing them not to consider it as evidence. where the indictment did not contain any information that could have assisted them properly in their deliberations and where their request for the indictment was known to be for an irrelevant reason, namely, curiosity about the delay between the date of the indictment and the time of trial, which carried the potential for prejudice to the defendant; in the circumstances the defendant was entitled to a new trial. [510-515]

INDICTMENT found and returned in the Superior Court Department on November 15, 1989.

Following review by this court, 35 Mass. App. Ct. 211 (1993), the case was retried before *Robert W. Banks,* J.

*Bruce Ferg* for the defendant.

*James A. Janda,* Special Assistant District Attorney, for the Commonwealth.

PERRETTA, J. In November, 1989, a grand jury returned an indictment against the defendant charging him with indecent assault and battery on a child under the age of fourteen and unlawful sexual intercourse with a child under sixteen years of age. As alleged in the indictment, the acts were committed between January, 1985, and March, 1989. Upon motion by the defendant, the time period of the acts specified in the indictment was limited to 1985.[1] The jury acquitted the defendant of the

---

[1] The motion was allowed because the acts alleged to have occurred after December 31, 1985, were alleged to have been committed in Rhode Island.

indecent assault and battery and found him guilty of rape. The defendant's conviction was reversed on appeal because of the admission of evidence of "fresh complaints" made forty-five months after the alleged incident. See *Commonwealth* v. *Johnson*, 35 Mass. App. Ct. 211 (1993) (*Johnson I*). During deliberations at the defendant's retrial in 1995, the jury expressed their concern about the six-year delay between the victim's 1989 complaint and the 1995 trial and asked to see the indictment, which was given to them over the defendant's objection. We reverse the conviction.

1. *The evidence.* At the time of the 1995 retrial, the victim, Theresa Smith,[2] was eighteen years old. She related that in 1985, her aunt and the aunt's seventeen-year-old boyfriend, the defendant, came to live temporarily with the Smith family in their apartment for a period of about two months. She testified that the defendant forced her to take his penis into her mouth on two occasions during his stay at the apartment. Theresa told no one about this incident until 1989. She explained that she was afraid, that she did not want to break up the relationship between her aunt and the defendant and her family's relationship with them. She also testified that she liked the defendant, and that he would take her and her siblings to the park and play with them.

Theresa further related that after her aunt and the defendant moved out of the apartment, she would go to their house "to sleep over there a lot." When they next moved to Providence, Rhode Island, Theresa would frequently take the bus to Providence, alone, to visit with them, sometimes staying as long as a month. She looked forward to and enjoyed her visits with her aunt and the defendant because they allowed her to be away from her step-father and because she "didn't get hit at their house." During these visits, she was alone with the defendant on "lots of occasions."

Theresa stated that she was fourteen years old when she first told someone, her ten-year-old brother, what the defendant had done to her. Her aunt had gone out to the store, and Theresa asked her brother to stay with her. She explained to him that, because the defendant had molested her, she was afraid to be alone with him. Within two or three days of that revelation, Theresa told her mother about the incident with the defendant,

[2]We use the pseudonyms assigned in *Johnson I*, 35 Mass. App. Ct. at 212 n.2.

and soon thereafter she spoke with people from the Department of Social Services and the district attorney's office. Theresa's conviction for unarmed robbery of a person over age sixty-five was used to impeach her credibility.

Testifying on his own behalf, the defendant related that he had stayed at Theresa's apartment for a short time in 1985, that he never had any problems with her or her siblings, that the Smith children were often left in his care and he would take them, including Theresa, to the park, and that after moving out of the Smiths' apartment, she would visit frequently and travel to Providence for extended stays. He denied having had any sexual contact whatsoever with Theresa.

2. *The jury instructions.* Immediately after the jury was empaneled, the trial judge gave preliminary instructions on the presumption of innocence, the role of the grand jury, and the function of an indictment. He instructed the jurors that they were not to draw any adverse inference from the fact of an indictment. In the course of his final charge to the jury, the trial judge instructed that the case was to be decided solely on the basis of the evidence, which in this case was testimony only, and he repeatedly told the jurors that they "may not decide this case on the basis of any guesswork," that they could not engage in speculation, nor could they "be influenced by any extraneous facts." He was emphatic: "The defendant is not to be found guilty . . . upon suspicion or conjecture. If he is to be found guilty, it must only be upon the competent evidence submitted during the course of the trial." He again explained the presumption of innocence and the function of an indictment.

Consistent with the ruling on the defendant's pretrial motion, see note 1, *supra,* the trial judge informed the jurors that the indictment alleged that the defendant had sexual intercourse with Theresa "on divers dates between January 1 of *1985* and December 31 of *1985*" (emphasis supplied). When the trial judge concluded his instructions, defense counsel approached the bench and asked that a copy of the indictment, which alleged that the acts occurred through 1989, not go with the jurors into their deliberations "[b]ecause if they see that, it will be confusing." The trial judge allowed that request and the jurors were sent into their deliberations, without the indictment, just prior to lunch.

3. *The jury deliberations.* Within two hours of the commencement of their deliberations, the jurors sent the trial judge a note,

"Please give more explanation for reasonable doubt in written form." The trial judge accommodated them with a copy of his charge on reasonable doubt. At 3:30 P.M., the jury sent another note: "We have 7 not guilty and 5 guilty. With this confusion could you please come and clear up a few points on this case?" The trial judge advised them that they were not to divulge the status of their deliberations and that, as they alone were to determine the guilt or innocence of the defendant, he could not assist them in their deliberation of the facts. The jury returned to their deliberations and were excused an hour later, to resume the next day at 9:30 A.M.

About an hour and one-half after the resumption of deliberations the next morning, the jury sent the following note: "We would like a transcript of all statements relative to events in 1989 when situation was brought to light to brother, any adults, DSS and the DA. We would like to know the date the grand jury signed the true bill. If possible, we would like a copy of the true bill." As put by the trial judge upon receipt of this question, "[t]hey want to know what has been going on for six years," that is, 1989 to 1995. He advised counsel that he would allow the jury to have the indictment but that he also would instruct them, once again, about the function of an indictment and that the return date "is of no significance." Although the prosecutor and defense counsel agreed that the jury was interested in the cause of what they perceived to be an unexplained delay in the commencement of criminal proceedings, neither wanted the jury to have the indictment. The prosecutor feared that the jury either would hold the unexplained delay between the return of the indictment and the present trial against the Commonwealth or speculate that the defendant had fled the jurisdiction. Defense counsel was concerned that the jury would surmise that, as was the case, the defendant had been found guilty previously and was being retried.

The trial judge ruled that a new indictment eliminating all reference to any acts by the defendant after December 31, 1985, was to be prepared and given to the jury and that he would re-instruct them about the role of the grand jury and the function of indictments. After again explaining grand jury procedures, the trial judge stated: "Now also, you would like to know the date the grand jury signed the true bill. That is not evidence in this case and it has nothing to do with your deliberations. When they heard the evidence, when the bill was returned, is of no

significance whatsoever." The jury again resumed their delibera-
tions, this time with the newly prepared indictment which
contained no reference to criminal acts occurring after December
31, 1985, but which nonetheless expressly stated that the true
bill had been returned on the second Monday of November,
1989. Forty-five minutes after receiving the indictment, the jury
returned its guilty verdict.

4. *Discussion.* It has long been the practice in this Com-
monwealth as well as in the Federal courts that whether a jury
will be allowed to take the indictment with them into their
deliberations is a matter within the trial judge's discretion.
When the jury is given the indictment, appropriate instructions
concerning its lack of probative significance are also to be
given. See *Commonwealth* v. *Donaruma,* 260 Mass. 233, 238-
239 (1927). See also *United States* v. *Medina,* 761 F.2d 12, 21
(1st Cir. 1985), and cases therein cited. The question before us,
therefore, is whether the trial judge abused his discretion in ac-
ceding to the jury's request to see the indictment.[3]

We note at the outset that this was not a complex case. The
jury were empaneled and the evidence presented all in one
morning. The sole question before the jury was whether the
defendant twice forced himself upon Theresa during his two-
month stay at her apartment. Resolution of that question
depended completely upon whether the jury accepted the
testimony (there were no exhibits) of Theresa or the defendant.
There was nothing in the indictment that properly could assist
the jury in resolving that issue. Indeed, the trial judge originally
granted the defendant's request to withhold the indictment from
them.

Although there had been a formal reading of the indictment,
including its date of return, at the outset of the trial, the jury's
request for information about that date during their deliberations
is strong indication that some, if not all, of them did not
remember that earlier reading. However, prior to receiving the
newly prepared indictment, the jury knew from Theresa's
testimony, if they were to accept it, that she had spoken with
representatives of the Department of Social Services and the
district attorney's office in 1989. The trial judge and counsel

---

[3]Although the Commonwealth contends that defense counsel failed to
preserve his right to appellate review of this ruling, the transcript shows that
defense counsel did object to the indictment being given to the jury but not to
the content of the instructions to be delivered along with the indictment.

construed the jury's request for the indictment as clear indication of their interest in the six-year time span between Theresa's complaint to various Commonwealth representatives and the defendant's instant trial.

There can be any number of reasons why the delay piqued their interest: had the Commonwealth's representatives disbelieved Theresa in 1989, had the defendant fled only to be apprehended recently, or had the defendant been found guilty previously and the present trial was, in fact, a retrial. So feared the prosecutor and defense counsel. Which, if any, of these hypotheses was accepted by the jury is itself a matter of speculation. What is certain, however, is that the perceived delay and any of its possible causes were of no legal significance and were inappropriate considerations, at least two of which (flight and retrial) could have worked to the defendant's prejudice.[4] Cf. *Commonwealth* v. *Ford,* 397 Mass. 298, 300 (1986).

The indictment should have been withheld and the jury instructed that its return date was of no significance or consequence and was not to be considered. We conclude that it was error to give the indictment to the jury where it did not contain any information which could have assisted them properly in their deliberations and where their request for the indictment was known to be for irrelevant reasons which carried the potential for prejudice to the defendant.

We are mindful of the fact that in giving the jury the indictment, the trial judge also gave strong instruction that they were to decide the defendant's guilt or innocence on the evidence alone and that the return date was of no legal significance. Although it is to be expected that jurors will follow a trial judge's instructions, see *Commonwealth* v. *Cameron,* 385 Mass. 660, 668 (1982), citing *Commonwealth* v. *Crehan,* 345 Mass. 609, 613 (1963), we do not think that expectation sufficient in the present case to enable us to conclude " 'with fair assurance' that the . . . [date of the grand jury's return of the indictment] did not have a significant impact on the jury's decision. See *Kotteakos* v. *United States,* 328 U.S. 750, 763-765 (1946)." *Commonwealth* v. *Ford,* 397 Mass. at 302.

---

[4]The Commonwealth's argument that any prejudice to the defendant was offset by elimination from the allegations of the indictment of all reference to any criminal acts between January, 1985, and March, 1989, falls far short of the mark. The defendant's claim of error concerns the jury's expressed interest in and their possible conjecture and speculation about the return date of the true bill which is clearly indicated on the indictment given the jury.

Not only do we think it inconsistent to grant the jury's request for specific information while simultaneously instructing them not to consider it, but the very request for the indictment demonstrated the jury's willingness to ignore the trial judge's instructions. He had told them twice before, at the outset of the trial and in his final charge, that the indictment was not evidence, that it was of no probative significance, and that the defendant's guilt or innocence was to be decided solely upon the basis of the evidence presented. Also of importance is the fact that this was a "contest of word against word." *Johnson I*, 35 Mass. App. Ct. at 217. As held in *Commonwealth* v. *Ford*, 397 Mass. at 302: "We conclude that the defendant has shown that 'the error possibly weakened his case in some significant way.' *Commonwealth* v. *Schulze*, 389 Mass. 735, 741 (1983)."

The defendant's remaining arguments, that the trial judge erred in refusing to instruct the jury on the probative value of Theresa's inconsistent conduct toward the defendant and her lack of fresh complaint, warrant no discussion beyond the statement that we see no error in the instructions given.

*Judgment reversed.*

*Verdict set aside.*