## COMMONWEALTH vs. GENE ALMEIDA.

No. 96-P-231.

Bristol. January 9, 1997. - May 14, 1997.

Present: WARNER, C.J., KAPLAN, & IRELAND, JJ.

*Evidence,* Prior misconduct, Hearsay, Prior consistent statement, Relevancy and materiality.

At the trial of indictments for sexual abuse and rape of a child, the admission of evidence that the defendant had bullied the victim into having an abortion when she was eighteen created a substantial risk of a miscarriage of justice, where the evidence was not probative of whether the defendant abused the victim during the period alleged in the indictments and where it was prejudicial. [611-613]

At the trial of indictments for rape and sexual abuse of a child in which credibility was the main issue, testimony concerning the victim's out-of-court statements, made before the period alleged in the indictment, concerning the sexual nature of her relationship with the defendant, was inadmissible hearsay and was incorrectly admitted and could have materially affected the jury's deliberations. [613-615]

Where a criminal defendant was deprived of a fair trial through the erroneous admission of certain evidence, a new trial was required. [615]

At the retrial of indictments for rape and sexual abuse of a child, evidence of the defendant's sexual activity with the victim outside of the period alleged in the indictments is properly admissible with appropriate instructions; evidence of the defendant's provision of drugs and alcohol to the victim, her sister and a friend is relevant and admissible; and evidence concerning events that occurred outside the indictment period after the victim turned sixteen is admissible as probative of the nature of the defendant's relationship to the victim. [615-617]

INDICTMENT found and returned in the Superior Court Department on September 9, 1993.

The case was tried before *Charles J. Hely,* J.

*Michael W. Reilly* for the defendant.

*David B. Mark,* Special Assistant District Attorney, for the Commonwealth.

WARNER, C.J. The defendant was convicted by a Superior

Court jury of rape of a child under the age of sixteen (G. L. c. 265, § 23).[1] A one-count indictment, returned on September 9, 1993, charged him with multiple acts of child abuse and rape. The indictment covered the period from on or about October 1, 1979, eight days short of the complainant's fifteenth birthday, to on or about October 19, 1980, the date of the complainant's sixteenth birthday.[2]

On appeal, the defendant argues that his conviction should be overturned because: 1) prejudicial evidence was improperly admitted alleging that he had engaged in uncharged misconduct; and 2) testimony regarding the complainant's out-of-court statements, alleged to have been made prior to the period covered by the indictment, was erroneously admitted at trial. Because the trial was infected by the improper admission of prejudicial evidence, the defendant's conviction must be reversed.

*The Commonwealth's case.*

a. *The beginning of the relationship and its progression.* The complainant, Karen Duquette, testified that she met the defendant, then in his mid-thirties and a disc jockey at a local radio station, in November, 1975, when she was eleven years old and telephoned the station in response to a promotion. He cajoled her into meeting him, and they began seeing each other several times a week. Within approximately a month, the two would drive in the defendant's truck to a deserted spot, where they had oral sex and vaginal intercourse. They smoked marijuana or cigarettes and drank alcohol as well.

Duquette's thirteen year old sister Janice, whom Duquette had told about the nature of the relationship, and Janice's friend, Edward Corrie, sometimes joined them. Both Janice and Corrie testified that the defendant provided them with alcohol and drugs. According to Duquette and Janice, when Janice threatened to tell their mother about the relationship, the defendant began providing Janice with gifts.

Duquette's mother discovered that Duquette was seeing the defendant when Duquette was almost thirteen years old. Duquette told her that there was nothing going on between them at that time. Duquette testified to having sex with the defen-

---

[1]On February 3, 1995, he was sentenced to from eight to ten years in State prison, four years to be served.

[2]The prosecution did not seek indictments for the period before October 1, 1979, viewing that period as barred by the statute of limitations.

dant frequently when she was thirteen and fourteen years old. When she was fifteen, the two would have sex five or more times a week in the defendant's trailer. He then began to pressure her to use cocaine and other drugs.

Duquette took three snapshots of the defendant, nude, when she was fifteen or sixteen. During a party in 1980, a friend found the photographs in Duquette's purse and laid them out on an hors d'oeuvres tray. Both Duquette and the friend testified about this incident.

Duquette's mother effectively abandoned her when Duquette turned sixteen. The defendant found an apartment for her, paid a down payment and the first month's rent, gave her some money, but not enough for her to live on, and told her that he did not want her to live with him. During that year, he informed her that he wanted to stop seeing her. In response, she took an overdose of drugs. The defendant brought her, semi-conscious, to St. Luke's Hospital. Duquette's hospital record lists her date of birth as October 20, 1963, rather than the correct date of October 20, 1964. The defendant knew her correct date of birth.[3]

b. *Duquette's pregnancy and abortion.* Duquette became pregnant by the defendant when she was eighteen. The defendant told her that if she had the baby, he would have nothing to do with her or the baby. As he drove her to an abortion clinic, Duquette cried. The defendant admonished her to "knock it off," because the clinic might refuse to perform the abortion if she seemed upset. He warned her repeatedly that if she had the child, the child would never see him. Duquette cried at the clinic and was sent home. The defendant berated her and threatened not to see her. The next week she had the abortion. The defendant paid for it.

Duquette ended the sexual relationship when she was eighteen, but continued to visit the defendant occasionally in order to get drugs from him. He moved to Florida when Duquette was nineteen.

---

[3]On direct examination the defendant testified that he had given the hospital some initial information when he brought Duquette in, but could not remember whether he had provided her birth date. Although it was never established who provided the information, the prosecutor implied in her closing argument that the defendant may have purposely given the hospital the wrong date to make Duquette seem older. There was no objection at trial and the issue was not raised on appeal.

c. *Duquette's disclosures about the relationship.* Duquette first formally reported the sexual abuse in 1992, when she went to a women's crisis center. A confluence of circumstances led her to make an official report at this time: her nieces and nephews were then in early adolescence, Duquette's age when she first met the defendant; she had recently encountered the defendant's sister; and she had seen the obituary of the defendant's former girlfriend, Sandy Duarte.

Duquette further testified that when she was thirteen years old she told her aunt, Helen Botelho, and Duquette's friend, Maria Fonteneau, that she was having sex with the defendant. Botelho testified that she spent three days a week at Duquette's house when Duquette was thirteen or fourteen years old, and observed the defendant coming to call for Duquette twice a week. Duquette appeared to be in love with him, and Botelho asked whether they were having sex. Duquette answered affirmatively, and the two had additional conversations about the sexual relationship during the course of the year.

Fonteneau testified that when she and Duquette were eleven years old, Duquette told her that she was dating the defendant. When the girls were fifteen, Duquette revealed that the relationship was sexual. Fonteneau further testified that when she and Duquette were fifteen or sixteen years old, she visited the couple in the defendant's trailer, where they all took drugs. There she observed Duquette and the defendant holding hands and kissing. Fonteneau occasionally stayed overnight, sleeping on the couch, while Duquette and the defendant slept in the bedroom. At the trailer, Fonteneau saw a photograph of Duquette, nude, on the defendant's bed.

*The defense case.*

The defendant testified that he became acquainted with Duquette's mother because she was an avid fan of the radio station where he worked. He was a family friend from 1975 to 1979 and had no romantic relationship with Duquette during this period. He testified that he drove Duquette, her sister, and their friends to specific destinations as a favor, and denied that they would cruise or park and take alcohol or marijuana. He described the extensive evening work and school schedule he had from 1975 to 1979.

The defendant began dating Sandy Duarte in September, 1975. They fell in love and remained together until 1981. At

that time, they had problems because Duquette tried to come between them, and their relationship ended. He and Duquette had a brief sexual relationship in 1981 or 1982. When Duquette became pregnant at the age of eighteen, she had been dating someone else and did not know who the father was. The defendant paid for her abortion to help her out of "another jam that she was in." They remained friends, and the defendant continued to see Duquette and her boyfriend, Bob Duquette, whom she eventually married, until the defendant moved to Florida in late 1986. The defense introduced in evidence greeting cards the Duquettes sent the defendant in 1983 and 1984.

The defendant's sister, Gwen Medeiros, testified that from 1975 through 1979 she saw the defendant with his girlfriend, Sandy Duarte, three or four times a week but never saw or knew of Duquette at that time. A co-employee of the defendant from 1975 to 1978 testified that he saw the defendant with Sandy Duarte almost every evening during this period.

Duquette was recalled as a rebuttal witness and testified that the defendant sent her greeting cards, some humorous and some affectionate, during the period of their relationship. Ten greeting cards were introduced in evidence.

1. *Uncharged misconduct and evidence concerning the complainant's abortion.* The defendant argues that the testimony concerning his role in procuring Duquette's abortion was inadmissible and highly prejudicial. Because he raises this issue for the first time on appeal, we examine the evidence to determine whether its admission created a substantial risk of a miscarriage of justice. *Commonwealth* v. *Almon*, 30 Mass. App. Ct. 721, 724-725 (1991). See *Commonwealth* v. *Amirault*, 424 Mass. 618, 648-651 (1997).

In determining whether instances of uncharged misconduct were erroneously admitted in evidence, we are mindful that such evidence "is justified on the theory that it relates not to a general disposition to repeat the same type of act because of bad or deficient character, but rather tends to prove other facts relevant to the ultimate issues in the case." Liacos, Massachusetts Evidence § 4.4.6, at 155 (6th ed. 1994), citing *Commonwealth* v. *Trapp*, 396 Mass. 202, 206 (1985).

The testimony at issue concerned events that occurred two years after the indictment period had ended. Duquette was eighteen years old when she had the abortion, and the defen-

dant admitted to having had a sexual relationship with her at that time. Thus, the evidence was not probative of whether the defendant had abused her sexually during the indictment period.

The defense apparently felt it necessary to respond, and a portion of its case was taken up with the defendant's denying Duquette's version of the event. The prosecutor further drew the jury's attention to the evidence by raising it in her closing argument, asserting that Duquette had undergone the abortion because the defendant threatened otherwise to have nothing to do with her.[4] The Commonwealth argues that the testimony was important because it described a "critical juncture" in the relationship.

The abortion testimony was the kind of evidence of uncharged misconduct that has long been proscribed. It "compel[led] the defendant to meet charges of which the indictment [gave] him no information . . . raise[d] a variety of issues, and thus divert[ed] the attention of the jury from the [crime] immediately before it; and, by showing the defendant to have been a knave on other occasions, create[d] a prejudice which may [have] cause[d] injustice to be done him." *Commonwealth* v. *Sapoznik*, 28 Mass. App. Ct. 236, 243-244 (1990), quoting from *Commonwealth* v. *Jackson*, 132 Mass. 16, 20-21 (1882). The evidence portrayed the defendant as a bad person who cruelly and callously bullied Duquette into having an abortion she did not want. The strong emotions associated with the subject of abortion may have intensified its prejudicial effect.

The testimony violated the "fundamental rule that the prosecution may not introduce evidence that a defendant previously has misbehaved, indictably or not, for the purpose of showing his bad character or propensity to commit the crime charged." *Commonwealth* v. *Trapp*, 396 Mass. at 206. Any minimal value it may have had in adding to an understanding of the relationship was far outweighed by its prejudicial

---

[4]The prosecutor argued: "Karen Duquette told you why [the defendant] was involved in [the abortion], why he took her down [to the abortion clinic in Providence]. She told you the reason he took her down was because he said, if you don't get the abortion, I'm not going to have anything to do with you. The reason she was crying so hard was because she didn't want the abortion, and the reason she went back was because he refused to speak to her until she got the abortion."

nature. See *Commonwealth* v. *Montanino*, 409 Mass. 500, 505-507 (1991); *Commonwealth* v. *Yelle*, 19 Mass. App. Ct. 465, 468-472 (1985); *Commonwealth* v. *Johnson*, 35 Mass. App. Ct. 211, 217-218 (1993) (all holding the improper admission of prejudicial uncharged misconduct reversible error). The evidence in this case was not "overwhelmingly one sided." *Commonwealth* v. *Amirault*, 424 Mass. at 651. The focus on the abortion could have led the jury to infer that the defendant's behavior demonstrated his bad character and thus his capability of sexually abusing Duquette when she was younger. We cannot attribute counsel's failure to raise this issue to a tactical decision. The admission of the abortion evidence raised a substantial risk of a miscarriage of justice. See *Commonwealth* v. *Almon*, 30 Mass. App. Ct. at 725.

2. *Admission of the complainant's pre-indictment out-of-court statements.* The defendant argues that the trial judge improperly admitted the following testimony concerning out-of-court disclosures Duquette allegedly made prior to the indictment period:[5] Duquette's testimony that between the ages of eleven and thirteen she told her sister Janice, her aunt Helen Botelho, and her friend Maria Fonteneau that she had a sexual relationship with the defendant; Botelho's testimony that Duquette, at age thirteen or fourteen, told her that she was having sex with the defendant; and Fonteneau's testimony that when Duquette was eleven, she told her that she was "dating" the defendant.[6] [7]

Except for Duquette's testimony about reporting to her sister Janice, the judge admitted the evidence of Duquette's prior disclosures after she had been cross-examined. He ruled that the defense had then put in issue the timing of her report of the abuse, and then admitted the testimony to put into "context" her failure to complain to authorities before 1992. We are aware of no such exception to the rule against the

---

[5]The defendant lodged appropriate objections to all but Duquette's testimony concerning her report to Janice.

[6]None of the above testimony was admitted as fresh complaint. Nor has the Commonwealth argued that it could properly have been so admitted. See *Commonwealth* v. *Johnson*, 35 Mass. App. Ct. at 219, which criticizes extending the application of "[t]he fresh complaint doctrine, . . . an anomaly in the law of evidence . . . justified for special reasons," to corroborate testimony concerning uncharged acts.

[7]Fonteneau's testimony that Duquette told her about the sexual nature of the relationship when she was fifteen years old is not at issue.

admission of hearsay. Testimony concerning Duquette's out-of-court disclosures made prior to the indictment period should not have been admitted.

The Commonwealth argues that the testimony was admissible under the exception to the hearsay rule for prior consistent statements, because cross-examination of Duquette had laid the foundation for an argument that her claims were of recent contrivance. "[A] witness's prior consistent statement is inadmissible, even where a prior inconsistent statement of the witness has been admitted. As an exception to this general rule, however, a witness's prior consistent statement is admissible where a claim is made that the witness's in-court statement is of recent contrivance or is the product of particular inducements or bias." *Commonwealth* v. *Zukoski,* 370 Mass. 23, 26-27 (1976) (citations omitted). See also *Commonwealth* v. *Healey,* 27 Mass. App. Ct. 30, 34-35 (1989), and cases cited.

The evidence elicited during the cross-examination which, the prosecution contends, suggested recent fabrication, consisted of the following: when confronted by her mother as a young teen-ager, Duquette denied having sex with the defendant; in 1992, when Duquette made her report to the authorities, she had been divorced and had seen an obituary of Sandy Duarte; learning of Duarte's death was a factor in Duquette's decision to complain to the authorities.[8] This did not amount to evidence strongly suggesting recent contrivance. Contrast *Id.* at 35-36; *Commonwealth* v. *Andrews,* 403 Mass. 441, 455 (1988).

Since the judge did not admit Duquette's prior disclosures under the rule for prior consistent statements, there is no indication on the record that he properly exercised his discretion to determine whether a claim of recent contrivance had actually been made, see *id.* at 454-455, or, if so, whether the admission of Duquette's prior statements was the appropriate means of countering such a claim. See *Commonwealth* v. *Darden,* 5 Mass. App. Ct. 522, 530 (1977). Particularly in view of Duquette's rebuttal testimony countering any implication

---

[8]In closing argument, the defense argued that in Duquette's difficult circumstances in 1992, her learning of Duarte's death brought back her sense of grievance toward the defendant and Duarte and caused her to bring her complaint.

that she had reason in 1992 to fabricate her claim,[9] the judge, in the proper exercise of his discretion, might well have determined that her prior statements were inadmissible.

We cannot say that the error was harmless. Assuming that the defendant waived his claim of error concerning the unobjected-to testimony regarding Duquette's report to her sister Janice,[10] we are left with four separate occasions during which the jury heard inadmissible testimony corroborating Duquette's version of the events. The defendant's credibility had been pitted against the complainant's, and the piling on of corroborative testimony could have materially affected the jury's deliberations. See *Commonwealth* v. *Trowbridge*, 419 Mass. 750, 760-762 (1995); *Commonwealth* v. *Swain*, 36 Mass. App. Ct. 433, 442 (1994), citing *Commonwealth* v. *Lavalley*, 410 Mass. 641, 646 (1991) (all concerning the danger of prejudice inherent in repetitive testimony which corroborates a witness's testimony).

*The judgment must be reversed.* Although the Commonwealth presented a strong case, the conclusion was not foregone. The jury deliberated for a day and one-half before arriving at a verdict. The erroneous admission of prejudicial evidence concerning the defendant's uncharged bad conduct, and of inadmissible hearsay corroborating the complainant's testimony, prevented the defendant from receiving a fair trial. The judgment must be reversed.

We address the defendant's other contentions regarding the admission of evidence concerning uncharged misconduct in order to resolve questions that might arise at retrial.

(1) Over the defendant's objection, the Commonwealth was permitted to present evidence of the defendant's sexual relationship with Duquette beginning when she was eleven years old. The trial judge properly exercised his discretion to admit this evidence. In order to comprehend the relationship between the defendant, who was in his mid-thirties, and the complainant, a fifteen year old girl, the jury needed to

---

[9]Duquette testified in rebuttal that in 1992, the year she made her report to the authorities, she was living with her fiancé. She no longer viewed Sandy Duarte as a rival, but rather as a fellow victim of the defendant.

[10]Because there was no objection to the admission of Duquette's testimony regarding her report to her sister Janice, the inquiry is whether its admission posed a substantial risk of a miscarriage of justice. *Commonwealth* v. *Keevan*, 400 Mass. 557, 562 (1987).

understand how it originated and developed. See *Commonwealth* v. *Young*, 382 Mass. 448, 463 (1981); *Commonwealth* v. *Robertson*, 408 Mass. 747, 749-751 (1990) (both concerning evidence relevant to understanding the relationship between the defendant and the victim or victims). The sexual activity alleged during the one-year indictment period was part of a continuing pattern, and needed to be described in context to be understood. See *Commonwealth* v. *Helfant*, 398 Mass. 214, 228 n.13 (1986); *Commonwealth* v. *Calcagno*, 31 Mass. App. Ct. 25, 26-28 (1991); *Commonwealth* v. *Brigham*, 32 Mass. App. Ct. 935, 936-937 (1992) (each concerning evidence of a continuing course of events or pattern of behavior). The judge instructed the jury that they could not consider sexual acts occurring before or after the date of the indictment as the basis for a guilty verdict,[11] and this instruction should be repeated at any retrial.

(2) Testimony was admitted regarding the defendant's provision of drugs and alcohol to Duquette, her sister Janice, and Edward Corrie, when Duquette was eleven years old.[12] This evidence, to which there was no objection, helped the jury to understand how the defendant controlled his relationship with the teenagers. See *Commonwealth* v. *McLeod*, 39 Mass. App. Ct. 461, 463-464 (1995). Its importance was made clear when Duquette testified that she temporarily stopped using drugs at the end of her eighth grade year "to make sure that I loved [the defendant] for who he was and not for the drugs." Likewise, evidence concerning the provision of drugs and alcohol to Janice and Edward Corrie helped to explain why they accompanied Duquette and the defendant on the drives where they observed the couple. It was also relevant to the contention that the defendant had purchased Janice's silence about the relationship.[13]

(3) Testimony was admitted about events that occurred

---

[11]At the request of the defense counsel, the judge refrained from instructing the jury on the purposes for which that evidence could be used.

[12]The defendant did object to the prosecutor's question to Duquette about why, around this time, her grades began to fail. Duquette was allowed to answer that drinking, marijuana, and the stress of the relationship were to blame.

[13]The defendant incorrectly states that no evidence was presented that he knew of Janice's threat to reveal the nature of the relationship to her mother. Janice testified that she made the threat to her sister "in front of [the defendant]." Asked about his reaction, she said "Dumbfounded. He

when Duquette turned sixteen. The defendant points specifically to Duquette's testimony that he did not want her to live with him, that he gave her money, but not enough to live on, and that she took an overdose of drugs when he told her that he wanted to end the relationship. This evidence, admitted without objection, concerned a time shortly after the indictment period.[14] It was probative of Duquette's contention, which the defendant challenged, that the two had been close during the indictment period. See *Commonwealth* v. *McLeod*, 39 Mass. App. Ct. at 464, and cases cited.

> *Judgment reversed.*
>
> *Verdict set aside.*

---

didn't know what I was talking about, I guess. I don't know. He just didn't say nothing." Asked when the defendant began to give her things, Janice replied, "Probably a week later or that same night. The first threat probably the same night."

[14]It is immaterial whether the acts occurred before or after the indictment period. *Commonwealth* v. *Odell*, 34 Mass. App. Ct. 100, 102-103 (1993).