COMMONWEALTH *vs.* KINISHA MILLS.

No. 97-P-537.

Suffolk. March 12, 1999. - August 3, 1999.

Present: BROWN, KAPLAN, & SPINA, JJ.

*Evidence,* Prior misconduct. *Practice, Criminal,* Instructions to jury.

At the trial of an indictment for armed robbery, the judge did not exceed her reasonable discretion in admitting evidence of other bad acts, similar robberies or attempts, offered to show a common plan [504-506]; however, where the judge failed to instruct the jury on the limited purposes for which that evidence could properly be considered by them, and where the judge erroneously instructed the jury in response to a direct question that they could decide what weight to give that evidence, a substantial risk of a miscarriage of justice was created and a new trial was required [506-507].

INDICTMENT found and returned in the Superior Court Department on January 25, 1995.

The case was tried before *Maria I. Lopez*, J.

*James R. Knudsen* for the defendant.

*Nancy L. Hathaway*, Assistant District Attorney, for the Commonwealth.

KAPLAN, J. In January, 1995, Kinisha Mills, eighteen years old, was indicted for the armed robbery on November 28, 1994, of Eric Holness, and for the like crime committed on December 5, 1994, upon Perry Silveria. After jury trial on these charges, the defendant was acquitted of the November 28 charge and convicted of the December 5 charge, and sentenced to imprisonment for two to four years at M.C.I., Cedar Junction, to be served at M.C.I., Framingham.[1]

Upon the defendant's appeal, we are obliged to reverse the

---

[1]There were accompanying indictments for conspiring, in the November 28 episode, with Keith Mills (the defendant's brother) and Donyell Howell (called "cousin" but not related), and in the December 5 episode, with Donyell Howell. These indictments were filed by the court without change of plea.

judgment of conviction, with opportunity for a new trial. On the defendant's claim that evidence of certain uncharged acts (so-called "bad acts") should have been excluded, we hold, despite doubts, that the judge's ruling to admit it was within her discretion.[2] However, there was error in the judge's failing to give any useful instructions to the jury on how they should consider the bad acts testimony, and in stating erroneously (in answer to the jury's specific questions) that they were free to give this evidence what weight they chose.

Between November 28 and December 13, 1994, armed robberies were committed or attempted on food deliverymen in the housing project area of Franklin Field, in the Dorchester section of Boston, and the instant prosecutions arose from those events. The evidence on the part of the Commonwealth came principally from the testimony of the victims Eric Holness and Perry Silveria, and from testimony by Detective John Martel, much of it derived from an interview he conducted with the defendant before her arrest, the text of which (heavily scarred with "inaudibles") was received in evidence.

### Six Incidents

(1) On November 28, 1994, a woman called Joseph's Pizza in the Mattapan area of Boston and ordered pizza to be delivered to 15 Ames Street. There is no evidence of the telephone number she gave. Holness, the deliveryman, said two women came to the door at 15 Ames and one paid for the pizza with a ten dollar bill. As Holness entered his truck, two men, sufficiently later identified as Keith Mills and Donyell Howell, came out of 21 Ames and walked up and one said, "Yo, nigger, give me the loot." Keith Mills (wearing, according to Holness, a black hooded sweatshirt) took $85 from Holness and struck him on the head with a black gun, while Howell stood watch.

(2) During the next week, possibly on December 1, a man called Joseph's Pizza and ordered chicken wings to 130 Stratton Street (next to Ames Street), giving the number 742-7930. Holness called back, as the number was not a Dorchester exchange. The number was out of order. Shortly a woman called and said her next door neighbor had just placed an order and given a

---

[2]The judge's ruling in limine to admit certain bad acts was the subject of an interlocutory appeal by the defendant to the Supreme Judicial Court. It was denied by the single justice without explanation.

wrong number; the woman gave the number 282-6194 and asked Holness to bring "change for a fifty." Holness, suspicious, did not deliver the order. The number last given in fact belonged to Marilyn Mills, the defendant's mother, at the address 132 Stratton Street.

(3) On December 5, a woman (the defendant, according to her statement to Martel) called Pete's Courthouse Deli ordering a large amount of food, and asked the man, Silveria, to bring change for a fifty. She gave the number 282-6194, said she was calling from 130 Stratton Street, but wanted delivery to 128 Stratton. Silveria drove out and parked nearby. Donyell Howell was on hand, said he was there to get the food. As Silveria handed it over, Howell pulled a .38 caliber silver gun from his waistband and said, "While you're doing that, why don't you run your loot," and lifted some $150 from the ground to where Silveria cast it.

(4) On December 8, a woman (the defendant, as she told Martel) ordered from Joseph's Pizza, gave the number 282-6194, and told Chris Beltran, who took the call, she wanted him to deliver to 126 Stratton Street, and to bring change for a fifty. Holness, who was present when the call came in, told Beltran the address named was in the area where he had been robbed and the number was that given in the December 1 order for chicken wings, which he had not delivered. Beltran called the police, the first time police help was sought. Holness drove past 126 Stratton three times in twenty minutes and saw near that address a black man in black clothing with a hood.

Detective Martel called 282-6194 from Joseph's Pizza and told the woman Joseph's was running late — did she still want delivery? She said yes. Martel, with plainclothesmen stationed nearby, attempted delivery at 126 Stratton, but the occupants declined. Martel said he saw two men in the vicinity wearing hoods. Martel again called the number; the person hung up.

(5) On December 10, a caller (identity, including gender, unknown) ordered food from China Sea restaurant, giving 120 Stratton Street as the place of delivery, and the number 282-6194. Sadrac Noel delivered the food. Howell and possibly Mills (Noel was unsure of identifying Mills) robbed him as he got out of his car near the address. One man wore a wool cap, the other a hood. One had a silver metal object; Noel thought it might have been a gun.

(6) On December 13, Letri Nguyen, on an order slip with the

number 288-5820, delivered food from the Yum Yum restaurant to 120 Stratton Street. A man, at the curb, said he was waiting for the food. As Nguyen rolled down his window, the man drew a silver gun from his waist. When Nguyen hit the gas to move away, the man shot him in the head. Called to the scene, Martel and another detective found on the floor of Nguyen's car the order slip and the food, and on the back seat a .38 caliber bullet. The telephone number corresponded with Howell's address at 78 Ames Street. (Nguyen in fact was rendered blind by the gunshot.)[3]

## Defendant's Statements to Martel

Under a search warrant for 132 Stratton Street, Martel and others searched the place on January 4, 1995. They found two menus from the China Sea restaurant and papers tending to show that the defendant and Keith Mills resided at this address with Marilyn. The defendant appeared during the search, and asked angrily what the police were up to. After conversation with Martel, the defendant agreed to go to the police station, and arriving there signed a waiver of Miranda rights.

The defendant said she would talk about Donyell Howell, but not about Keith Mills. She told Martel she had made telephone calls to Pete's Courthouse Deli on December 5, and to Joseph's Pizza on December 8 and on at least one other occasion, and in these instances she asked change for a fifty. On December 5 she gave Howell money and knew he would pick up the food. When he came back that night, there was a .38 caliber gun in his waistband. He had the food and some $130. Howell said he had robbed the guy, but she told Howell she "didn't" or "couldn't" believe he robbed him.

The evening of December 8, Howell came in and said there was "five-O all over the place." She asked about the food; he said he had intended to rob the deliveryman but there were too many police around.

The defendant denied calling the China Sea or Yum Yum restaurants and denied that she or Keith Mills knew that calls were made at the time. She said her mother said Howell had called these restaurants.

Martel asked why she ordered deliveries at addresses other

[3]By agreement, Nguyen was not called, and Martel testified about this incident.

than her own. She said she didn't know; Howell told her where to ask deliveries. Why change for a fifty? Her mother gave her only fifty dollar bills.

Martel asked the defendant to help in finding Howell's gun and she agreed to try. She agreed not to tell Howell or others about the investigation. A couple of days later, the defendant, answering Martel on the telephone, said angrily that Howell's father had learned of her talk with the police. Thereafter she did not cooperate with Martel.

1. *Whether the judge abused discretion in admitting bad acts of December 10 and 13.* The Commonwealth was trying the two armed robbery charges (November 28 and December 5) on a joint venture basis. The venture envisaged was not the kind where the defendant is alleged to have been present at the scene of the crime with intention or agreement as described in *Commonwealth* v. *Longo*, 402 Mass. 482, 486 (1988).[4] Rather the defendant was alleged to have aided in the commission of the crime or acted as an accessory thereto before the fact, as stated at G. L. c. 274, § 2.[5] See *Commonwealth* v. *Raposo*, 413 Mass. 182, 184-185 (1992); *Commonwealth* v. *Ortiz*, 424 Mass. 856, 856-858 (1997). The latter form of joint participation is more at large, less contained, than the former, and may call for particular caution or circumspection when it comes to admitting uncharged acts by way of proof of the venture and thus of the commission of the crime: for, in considering a defendant's general accessorial responsibility, the triers may find it hard to distinguish between the uncharged acts and the real thing.

The Commonwealth's direct proof of the December 5 incident was not so strong as to render insignificant an error in admitting the evidence of bad acts, and the Commonwealth was surely relying on that evidence. The defendant contends there was an abuse of discretion in admitting the China Sea and Yum Yum

---

[4]"The test [for joint venture] is whether each defendant was (1) present at the scene of the crime, (2) with knowledge that another intends to commit the crime or with intent to commit a crime, and (3) by agreement is willing and available to help the other if necessary."

[5]General Laws c. 274, § 2, as appearing in St. 1973, c. 529, § 1: "Whoever aids in the commission of a felony, or is accessory thereto before the fact by counselling, hiring or otherwise procuring such felony to be committed, shall be punished in the manner provided for the punishment of the principal felon."

incidents (objected to in limine and also at trial).[6] The defendant, although free with some admissions, denied involvement in these two incidents, and there is no demonstrative evidence she was involved, barring only that the number 282-6194 turned up on December 10. That number was absent in the event of December 13, and it is Howell's number that shows. The delivery address in both cases was 120 Stratton Street, which had not appeared in the other incidents. The defendant says the value of the evidence as probative of her guilt of the December 5 charge, if not nugatory, was weak, while the prejudice factor was great, especially when the shot to the head was allowed to stir imaginations. Compare cases where prejudice was found to preponderate over probative value: *Commonwealth* v. *Sapoznik*, 28 Mass. App. Ct. 236, 244-245 (1990); *Commonwealth* v. *Benitez*, 37 Mass. App. Ct. 722, 725 (1994); *Commonwealth* v. *Almeida*, 42 Mass. App. Ct. 607, 612-613 (1997).

If the probative value of the bad acts in these instances is judged to be weighty enough to exceed or cancel out the prejudice with which it is burdened, the evidence nevertheless should have been excluded, so the argument goes, because it was cumulative and tended to become overbearing and a handicap to reasoned decision. The jury heard as bad acts the incidents of December 1 and December 8 (and they also heard the evidence on the November 28 charge proper). The December 10 and 13 incidents could count as surplusage. It has long been recognized that bad acts, even when nominally offered to show common plan or some other legitimate object, become dangerously confusing to the triers when piled on and unduly exaggerated. See *Commonwealth* v. *Picariello*, 40 Mass. App. Ct. 902, 904 (1996); *Commonwealth* v. *Almeida*, 42 Mass. App. Ct. at 613; *Commonwealth* v. *Roche*, 44 Mass. App. Ct. 372, 380-381 (1998).

Notwithstanding the factors above noted that speak against admitting the December 10 and 13 incidents, we do not think it can be held that the judge so far exceeded a reasonable discretion that the judgment must be reversed on that ground.[7] However, this bad acts testimony having come in, there was

---

[6]The defense objected to the admission of all uncharged acts but the weight of the objection was on the incidents of December 10 and 13.

[7]Non constat, a judge upon a new trial, hearing the evidence as it then shapes up, might find justification for exercising discretion in the opposite direction.

need to instruct the jury with particular care what to do in order to avoid diversionary misuse of the material.

2. *Error in failing to instruct, and then misinstructing on bad acts.* As the case went to the jury, they had heard evidence of the four episodes of December 1, December 8, December 10, and December 13, all received as bad acts. It was quite important that the judge should instruct the jury of the limited purposes for which such evidence could properly be considered by them. (See the enumeration of these purposes in *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. 810, 817-818 [1998]). No such instructions were given. Strangely, defense counsel did not ask the judge to charge on the point or complain of the judge's failure to do so. The judge's omission to charge on so obvious a point on her own motion is equally hard to understand.[8]

The mistake was compounded when the jury, in one of their requests for further instructions, expressly asked the judge for help on the very question of the use they could properly make of evidence outside that directly related to the events of November 28 and December 5. The searching question put to the judge was:

> "How much leeway do we have to apply the events after December 5, 1994 to (a) her character on November 28 and December 5, (b) her actions on November 28 and December 5, and (c) her motivation on November 28 and December 5, and (d) her conscious knowledge on December 5."

The judge's uninforming and erroneous answer was:

> "You have whatever — you give the events after December 5, 1994, whatever degree of weight you deem they are entitled to receive with respect to the fact issues that you have to decide. The evidence was admitted so that you would be able to consider it and decide what weight to give it."

Again, defense counsel raised no objection.

Even if the seriousness of the errors in failing to instruct and

---

[8]The Commonwealth does not suggest that defense counsel was pursuing a strategy in failing to request an instruction, and the judge need not have played along with a strategy if there was one.

in failing to give a proper answer to the jury's question is to be adjudged by reference to the standard of *Commonwealth* v. *Freeman*, 352 Mass. 556, 563-564 (1967),[9] recently expounded in *Commonwealth* v. *Alphas*, 430 Mass. 8, 13-14, 20-23 (1999), we believe the result must be to hold that the errors fatally infected the judgment of conviction.[10]

3. *Other points.* Upon a new trial, it would be well for the Commonwealth, out of abundant caution, to refrain from introducing testimony by a detective which characterizes the defendant as "street wise" or to indicate that at a given point the defendant ceased to cooperate with the police.[11]

*Judgment reversed.*

*Verdict set aside.*

---

[9]"The question is whether the error was of a type and seriousness which should lead us to reverse in the absence of a proper exception. The test is whether there is a substantial risk of a miscarriage of justice."

[10]The jury were asking in effect whether they could consider the uncharged acts as demonstrating the defendant's bad character (or propensity to commit the crime). The answer should have been no. See *Commonwealth* v. *Ellis*, 321 Mass. 669, 670 (1947); *Commonwealth* v. *Triplett*, 398 Mass. 561, 562-564 (1986); *Commonwealth* v. *Almeida*, 42 Mass. App. Ct. at 613; *Commonwealth* v. *Hanlon*, 44 Mass. App. Ct. at 817 & 818 n.5. So also the jury should have been given deliberated answers to their other questions.

[11]Upon a retrial, if evidence of the December 10 and 13 incidents is not offered or is excluded, the bad acts testimony about December 1 and 8 might remain, still calling for instructions on how the jury could properly employ that evidence.