COMMONWEALTH *vs.* IAGO I.,[1] a juvenile.

No. 09-P-761.

Hampden. May 6, 2010. - August 5, 2010.

Present: GRASSO, BROWN, & KAFKER, JJ.

*Evidence,* Expert opinion, Prior misconduct, Cumulative evidence. *Burning of Property. Practice, Criminal,* Instructions to jury, Agreement between prosecutor and witness, Argument by prosecutor. *Witness,* Credibility.

At the trial of a complaint charging a juvenile with burning a building, the judge did not err in admitting in evidence the testimony of a State police trooper as an expert witness, or in instructing the jury regarding the determination of which witnesses to believe and how much weight to give their testimony. [330-331]

At the trial of a complaint charging a juvenile with burning a building, no substantial risk of a miscarriage of justice arose from the admission of evidence that the juvenile's nickname had been spray painted near the sites of prior fires, on the basis that such evidence constituted a pattern of conduct, or from the judge's failure to give a limiting instruction regarding the use of evidence of prior misconduct, where the import of the evidence (that the juvenile had a propensity to start fires) was rendered largely insignificant by the testimony of other witnesses, and where the omission of a limiting instruction may have assisted the defense to the extent that the jury were not reminded of the spray painting evidence. [331-333]

At the trial of a complaint charging a juvenile with burning a building, no substantial risk of a miscarriage of justice arose from the judge's failure to instruct the jury to take "particular care" in evaluating the credibility of a witness who testified under an agreement with the prosecutor, where the judge's detailed instructions on the assessment of witness credibility were adequate. [334]

At the trial of a complaint charging a juvenile with burning a building, there was no merit to the juvenile's claim of error in the prosecutor's closing argument. [334-335]

COMPLAINT received and sworn to in the Holyoke Division of the Juvenile Court Department on June 11, 2008.

The case was tried before *Patricia M. Dunbar,* J.

*Dianne M. Dillon,* Assistant District Attorney, for the Commonwealth.

*Craig R. Bartolomei* for the defendant.

---

[1] A pseudonym.

BROWN, J. After a jury trial in the Juvenile Court, the juvenile was adjudicated delinquent on a complaint charging him with burning a building.[2] On appeal the juvenile claims that (1) expert testimony was improperly admitted and the judge failed to instruct the jury on the weight to be given expert opinion evidence; (2) prior bad act evidence should have been excluded and the failure to give a limiting instruction exacerbated the error; (3) the judge should have given a *Ciampa* instruction, see *Commonwealth v. Ciampa*, 406 Mass. 257, 266 (1989); (4) the prosecutor's closing argument was improper; and (5) the cumulative effect of the errors requires relief.

Evidence at trial revealed the following. Sometime between 7:00 P.M. and 8:30 P.M., on June 9, 2008, the juvenile and Karen Smith[3] entered an abandoned paper factory on Sargeant Street in Holyoke for the second time that day. The building was a mess, with paper, cardboard, cloth, trash, and machinery throughout the interior. While they were inside the building, the juvenile told Smith that he wanted to burn it down because "he might be getting locked up the next day." The juvenile also said that he wanted to use gasoline but he did not have any. She saw him light some paper on fire with a lighter and then put it out. After they were inside the building for about twenty minutes, it began to get dark. Smith became frightened when she heard some banging noises coming from the opposite side of the building and she walked out. The juvenile remained behind.

When Smith got to the exterior corner of the factory, she called for the juvenile. He came out and urged her "just to go." They walked away together and headed toward Sargeant Street. When Smith looked back about ten minutes later, she saw smoke

---

[2]The juvenile was also charged with breaking and entering in the nighttime with the intent to commit a felony. The record is silent as to the resolution of this offense. The judge apparently turned off the microphone at every sidebar conference, including the one that occurred at the conclusion of the Commonwealth's case.

The practice of conducting conferences not on the record is disfavored. See *Commonwealth v. Mercado*, 452 Mass. 662, 669 n.11 (2008), citing *Commonwealth v. Fanelli*, 412 Mass. 497, 501 (1992) ("we emphasize again the importance of recording all conferences"). See also *Commonwealth v. Adams*, 34 Mass. App. Ct. 516, 517 n.3 (1993).

[3]A pseudonym; Smith is a minor.

coming from the first-floor windows that were about six to ten windows away from where they had just been.[4]

After parting company with Smith, the juvenile met a friend, one Bill Jones,[5] who was watching the fire from Main Street in Holyoke. Jones and the juvenile had been friends for about five years, and Jones knew him by the nickname "Nano." The juvenile admitted to Jones that he had started the fire inside the building by "li[ghting] some papers." The juvenile said that he and Smith had been inside the factory, but that she left before he did and claimed that she "did [no]t help him start the fire." Jones also testified about several other fires. He claimed to have been with the juvenile when the juvenile broke the door to a South Street building, went inside, and then came out as the building "was bursting in fire." Jones also testified that he had seen dumpsters "go on fire" when the juvenile was near them. State police Trooper David Percy was called to the scene to investigate the cause of the fire and by the time he arrived, he saw approximately 100 fire fighters, from eighteen or nineteen towns, battling the flames at the abandoned factory. Percy also saw the juvenile at the scene and spoke to him.[6] Percy had spoken to the juvenile previously, and knew him by his nickname, Nano.

Trooper Michael Mazza, a twenty-year veteran of the fire and explosion investigation section of the State police, was also summoned to the scene. Mazza's investigation included canvassing the neighborhood, talking to the fire fighters who arrived first to the fire, and examining the building and the fire progression.[7] Mazza also testified that he had spoken with the

---

[4]Smith acknowledged that she had signed a cooperation agreement with the prosecution under which she would not be charged with any offense related to this incident in exchange for her truthful testimony. The agreement was admitted in evidence.

[5]A pseudonym; Jones is a minor.

[6]A motion to suppress the juvenile's statements was "allowed in part." No statement by the juvenile to police during this initial contact was offered or admitted in evidence.

[7]Mazza gave an opinion, over objection, that the fire started on the first floor on the Sargeant Street side of the building. Mazza also gave an opinion, over objection, that the fire had been intentionally set, rather than having been the result of an accident. Finally, Mazza explained that in his opinion the fire was caused by "an open flame [that] was introduced to the available combustible materials strewn throughout the first floor."

juvenile the day after the fire, and the juvenile denied being in the building during the time in question.

The juvenile claimed that the police were under tremendous pressure to find the culprit who started the fire because it occurred on the heels of thirty-one other suspicious fires in Holyoke that remained unsolved. Because of that pressure, the defense claimed, the police induced two youngsters to inculpate falsely the juvenile. The defense called three witnesses, each of whom outlined the initial contact police had with the juvenile at the scene where the police purportedly placed the juvenile, alone, into a vehicle for questioning, letting him go only after both his parents arrived at the vehicle and argued for their son's release.

*Discussion.* 1. *Expert testimony.* The juvenile argues that the judge abused her discretion in permitting Mazza to give his opinion, over the juvenile's objections, to the origin and cause of the fire. In support of this claim, the juvenile relies solely on the judge's denial of the prosecutor's request on the second day of trial to amend its witness list so that Mazza, who was already included on that list, would be designated an expert witness.[8] See Mass.R.Crim.P. 14(a)(1)(A)(vi), as amended, 444 Mass. 1501 (2005). The juvenile argues obliquely that this ruling should have precluded the expert opinion evidence as a sanction for noncompliance with discovery rules.[9]

We discern no error in the admission of this evidence. See *Commonwealth* v. *Hamilton,* 426 Mass. 67, 70 (1997) (exclusion of evidence not warranted without a showing of prejudice when the late disclosure was not the result of bad faith on the part of the prosecutor). There was no basis upon which to exclude this testimony merely because the prosecutor had omitted the "expert" designation from the witness list. The defense had twice had the opportunity to hear and cross-examine Mazza at

---

[8]Mazza had already testified as an expert and had been cross-examined at two previous hearings in this case (namely, a dangerousness hearing and a motion to dismiss), and in addition, his report had been timely disclosed in advance of trial to the defense. The only discovery outstanding was the witness's curriculum vitae, which the prosecution was in the process of providing to the defense.

[9]Among the sanctions permitted for noncompliance with Mass.R.Crim.P. 14(a)(1)(A)(vi) is the exclusion of otherwise admissible evidence. See Mass. R.Crim.P. 14(c)(2), as amended, 444 Mass. 1501 (2005).

the pretrial hearings. In addition, the defense had timely been given a copy of his report which set out his opinion.

Moreover, we think the record supports a "prior determination" by the judge that she found Mazza's experience qualified him to render the opinion that the fire was intentionally set by an open flame coming in contact with the combustible material in the abandoned factory.[10] See, e.g., *Commonwealth* v. *Cantres,* 405 Mass. 238, 246 (1989). See also Mass. G. Evid. § 702 (2010). There was no error in this determination.

Nor do we think the judge erred in omitting a specific instruction regarding the weight to be given an expert's testimony, when none was requested. The judge properly instructed the jury to "determine which witnesses to believe and how much weight to give their testimony." *Commonwealth* v. *Dancy,* 75 Mass. App. Ct. 175, 186 n.8 (2009).

2. *Prior bad act evidence.* Next, the juvenile claims that the judge should not have allowed the Commonwealth's motion in limine to admit evidence connecting the juvenile to other fires in Holyoke. After determining that the evidence showed a modus operandi and evinced a special mark or distinctiveness, the judge found that the juvenile's nickname spray painted near the sites of prior fires constituted a "pattern of conduct" and, therefore, was admissible. As a result, Trooper Percy testified at trial, without objection, that between March, 2008, and June, 2008, he investigated several other fires in Holyoke where he had observed the name Nano[11] spray painted "in close proximity and on some of the buildings" where the fires occurred.[12] Percy referred to this practice of putting a name or a sign on a particular location as "tagging." In addition, photographs depict-

---

[10]The juvenile acknowledges on appeal that Mazza had the training and experience to qualify him as an expert witness.

[11]As previously mentioned, the juvenile was known to have the nickname, Nano.

[12]Percy identified six fires where the juvenile's nickname was observed: (1) a garage that was the site of a small fire with the name "Nano" spray painted on it; (2) a fire at a building on Hamilton Street, near the juvenile's residence, that had "Nano" written on it; (3) & (4) a "couple of dumpster fires in close proximity to the Hamilton Street fire"; (5) a second garage that was the scene of a fire with the name "Nano" spray painted on the side of the building; and (6) that "Nano" was written near the scene of a fire at a third garage and small trailer.

ing the "tags" described by Percy were admitted in evidence. Percy conceded during cross-examination that "[t]here was no indication of any spray-painting or Nano on . . . the building that burned." Percy also acknowledged that the juvenile had not been charged in relation to any of the previous fires.[13]

Where, as here, the juvenile denies committing the charged offense, prior misconduct may be offered to prove the identity of the person who committed the crime or to show a pattern of conduct, provided that the prior bad acts and the circumstances of the crime charged "have such similarities as to be meaningfully distinctive." *Commonwealth* v. *Montez*, 450 Mass. 736, 744 (2008), quoting from *Commonwealth* v. *Brusgulis*, 406 Mass. 501, 505 (1990). See Mass. G. Evid. § 404(b). "There must be a uniqueness of technique, a distinctiveness, or a particularly distinguishing pattern of conduct common to the *current* and *former* incidents to warrant the admission of evidence of prior bad acts as tending to prove that the juvenile was the person who committed the crime charged" (emphasis added). *Commonwealth* v. *Brusgulis, supra* at 506. "It is not enough that there is some 'general, although less than unique or distinct, similarity between the incidents.' " *Commonwealth* v. *Kater*, 432 Mass. 404, 414 (2000), quoting from *Commonwealth* v. *Jackson*, 417 Mass. 830, 836 (1994). Although there was no evidence that the purportedly unique mark of "Nano" was placed at or near the current fire,[14] Jones provided testimony that linked the juvenile to three of the six fires described by Percy, namely one building fire and the two dumpster fires. Contrast *Commonwealth* v. *Helfant*, 398 Mass. 214, 224-225 (1986).

The juvenile argues that the error was exacerbated by the failure of the judge to instruct the jury regarding the limited use of this prior bad conduct evidence, although the juvenile made no request for such an instruction.[15] We pass on the question

---

[13]Although the prosecutor had indicated during the pretrial hearing that "there was also tagging of the name Nano across the street from the current fire," that evidence was not adduced at trial.

[14]We also are cognizant of the fact that Jones made clear that the name "Nano" not only appeared near fires, but that "Nano" was spray painted "[e]verywhere" in their neighborhood, including on floors, buildings, and trucks. However, there was no testimony that the defendant himself was responsible for the Nano tags.

[15]At the conclusion of the motion in limine, the judge indicated she would

whether there was any error. Because the juvenile did not object to admission of the evidence, the test is whether the error, if any, created a substantial risk of a miscarriage of justice, see *Commonwealth* v. *McCoy*, 456 Mass. 838, 850 (2010), and cases cited therein, and we conclude that there was no such risk. The import of the evidence (that the juvenile had a propensity to start fires) was rendered largely insignificant by the testimony of Smith and Jones. Smith testified she was with the juvenile minutes before the fire started. The juvenile not only told her he wanted to burn the building down but demonstrated that he had the ability to do so by lighting some papers on fire. In addition, Jones testified that as he and the juvenile watched the building burn, the juvenile told him he started the fire. This evidence was strengthened by the juvenile's presence near the fire when the fire fighters and law enforcement personnel arrived and by evidence that the origin and the cause of the fire were consistent with the juvenile's statements to Smith and Jones and Smith's observations of the juvenile minutes before the fire began. Moreover, the evidence that the juvenile's nickname had been observed near other fires, but not at the one in question, was not inconsistent with the defense, which was that the police only arrested the juvenile because they suspected him of having caused other suspicious fires in the city, and needed someone to blame for this fire regardless of his culpability. Given all these circumstances, we conclude that the admitted evidence did not create a substantial risk of a miscarriage of justice.

This conclusion is not altered by the judge's omission of a jury instruction limiting its use. Where, as here, the juvenile did not request such an instruction, the judge is not required to give a limiting instruction. See *Commonwealth* v. *Delong*, 60 Mass. App. Ct. 122, 131 (2003); Mass. G. Evid. § 105. Compare *Commonwealth* v. *Mills*, 47 Mass. App. Ct. 500, 506 (1999). Its omission may have assisted the defense to the extent the jury were not reminded of the tagging evidence. Contrast *Commonwealth* v. *Baker*, 440 Mass. 519, 531 (2003). In any event, we are confident that in this regard it has not been made to appear that there has been a substantial risk of a miscarriage of justice.

give such an instruction, but apparently forgot to do so, and the juvenile did not object to the omission.

3. *Omission of instruction on assessment of testimony given pursuant to agreement.* The juvenile argues that because Smith testified under a written agreement with the prosecutor promising not to charge her, the judge should have given a "so-called" *Ciampa* instruction, sua sponte, specifically mentioning that "particular care" must be taken in evaluating her credibility. See *Commonwealth* v. *Ciampa*, 406 Mass at 266. See also Mass. G. Evid. § 1104. Even if we were to conclude the agreement at issue was of the type requiring a *Ciampa* instruction, its omission would not have created a substantial risk of a miscarriage of justice.

The judge in this case gave detailed instructions on how to assess a witness's credibility, including the admonition to consider a witness's "motive for testifying, . . . whether the [witness] displays any bias in testifying, or whether or not he or she has any interest in the outcome of the case." *Commonwealth* v. *Smiley*, 431 Mass. 477, 486 (2000).

These instructions were adequate, particularly in light of the fact that defense counsel vigorously cross-examined Smith, and strenuously argued to the jury that she should not be believed because she was getting a "free pass" on her own wrongdoing. In addition, a review of the prosecutor's closing argument shows that she did not cross the line drawn by the court in *Ciampa*, namely, she neither explicitly nor implicitly vouched to the jury that she *knew* that Smith's testimony was true because of their agreement. See *Commonwealth* v. *Rivera*, 430 Mass. 91, 96 (1999). Rather, the prosecutor merely suggested that Smith was credible, most notably because she had provided her inculpatory account to police before she met the prosecutor and signed the agreement. See *Commonwealth* v. *Ciampa*, 406 Mass. at 265; *Commonwealth* v. *Marrero*, 436 Mass. 488, 501 (2002).

Accordingly, any error in the omission of the instruction that the Commonwealth could not and did not know if Smith's testimony was true did not create a substantial risk of a miscarriage of justice.

4. *Closing argument.* Contrary to the juvenile's claim, the prosecutor's argument — that Smith left the building because she "knew" something was going to happen and that Smith saw the juvenile light "papers" on fire, rather than a "paper" — did

not exceed the scope of the inferences that could be fairly drawn from the properly admitted evidence.

5. *Cumulative errors.* Finally, we find no error, cumulative or otherwise, sufficient to warrant reversal of the juvenile's adjudication of delinquency. Contrast *Commonwealth* v. *Cancel,* 394 Mass. 567, 576 (1985).

> *Adjudication of delinquency*
> *affirmed.*